[Crim. No. 9078. · In Bank. Nov. 12, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN MARK
ARANDA et al., Defendants and Appellants.

Caryl Warner and Charles Hamel, under appointment by the Supreme Court, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendants appeal from judgments of conviction entered after a jury found them guilty of robbery in the first degree. (Pen. Code, § 211a.)

About 4:30 p. m., July 10, 1962, Louis Luna was watching television with Betty Holbrook in the back room of his jewelry store on North Main Street in Los Angeles. Luna heard the door buzzer and went into the front room of the store where he saw two men. One was holding what appeared to be a nickel-plated .25 caliber automatic in one hand and a lunch box in the other. The gunman ordered Luna to "put the money in the box," and when Luna replied that he had none, the man told him to give him his keys. He then took Luna into the back room, tied his hands with a piece of cord, and forced him to lie face down on the floor. He ordered Miss Holbrook to face the wall and then returned to the front of the store.

At this juncture, Alex Salgado entered the shop to have his watch repaired. He saw the back of one man by the open safe and another man holding what he thought was a .38 or

a .45 caliber gun. Salgado could see only the gunman's face since his body was hidden by the safe. The latter pointed the gun at Salgado and spoke to him, and Salgado left, went across the street, and called the police.

Police officers found two fingerprints, later identified as those of defendant Martinez, on a black box containing a lighter. The men had taken money, new jewelry, several customers' watches, and a Smith and Wesson gun.

About a week later at approximately 2:30 a.m. Police Officer Collier and his partner saw Martinez walking along Emma Street. Officer Collier knew Martinez and offered him a ride, which he accepted. Martinez said that he was going to defendant Aranda's apartment. The officers let him out of the car at Lincoln Park Avenue and watched where he went. They followed him to Aranda's apartment, where they arrested both defendants. Officer Collier told Martinez that he had been identified as one of the perpetrators of an armed robbery.

In a later search of Aranda's apartment, which he shared with his mother, the police found three .25 caliber shells in a bedroom. The gun used in the robbery was never found.

Luna was not able to make more than a tentative identification of Martinez either at the police lineup or at the trial. The only other evidence against Martinez was his fingerprints and a confession that he made after a series of interrogation sessions with the police on July 17, the day of his arrest. Officer Becker testified that Martinez voluntarily confessed that he and Aranda committed the robbery.[1] Officer Becker, who was alone with Martinez at the time, made notes of the conversation but he neither made a tape recording of it nor had Martinez sign a confession.

---

[1] At the trial, Officer Becker related his conversation with Martinez as follows: "He stated that on the day of the robbery, that on the 10th of July 1962, that he and Chop Chop, meaning defendant Aranda had either been working some place or had been looking for work. That they were on their way home and all of a sudden decided to rob a jewelry store there at North Main, Luna's Jewelry Store. He said that after the robbery they had ran [sic] down to Chaleco's Bar where they had sat for some time. I asked him if he could recover any of the property, any of the jewelry or the watches or money or the gun. He said no, that as far as he knew, the jewelry had been sold to some fence in East L.A. and that the gun had been sold to an unknown male at Chaleco's Bar. I asked him if he knew why the twine or the rope that was used to tie Mr. Luna had a sweet smell to it and he said that it was because Chop Chop used to carry his shaving equipment in his lunch box along with the rope and that at one time the shaving lotion had leaked out and made the rope smell. He then requested not to let Chop Chop know that he had admitted the robbery."

Martinez testified on his own behalf and denied committing the robbery or making a confession to the police. To explain the fingerprints in Luna's office, he testified that he had gone to the shop on several occasions before the robbery and once while looking for a gift for his cousin, had handled the lighter and the box on which his fingerprints were found.

At the time of Martinez's confession, the investigation into the robbery had ceased to be a general inquiry into an unsolved crime and had focused on him and Aranda. Martinez had been taken into custody and was being interrogated for the purpose of eliciting incriminating statements. Nothing in the record indicates that he had been advised of his rights to counsel and to remain silent or that he had waived those rights. Under such circumstances, the confession obtained was inadmissible by virtue of the decision of the United States Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. (*People* v. *Bilderbach,* 62 Cal.2d 757, 761-762 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Lilliock,* 62 Cal.2d 618, 621-622 [43 Cal.Rptr. 699, 401 P.2d 4]; *People* v. *Stewart,* 62 Cal.2d 571, 576-581 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) Since this case was tried before the *Escobedo* decision, Martinez's failure to object to the admission of the confession into evidence does not preclude his raising the question on appeal. (*People* v. *Davis,* 62 Cal.2d 791, 796 [44 Cal.Rptr. 441, 402 P.2d 129]; *People* v. *Hillery,* 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382].) The judgment against defendant Martinez must therefore be reversed.

On the day that defendant Aranda was arrested, Luna and Salgado identified him at a police lineup as one of the robbers. Both men repeated their identification at the trial.[2] Luna also stated that the cord used to tie him smelled of perfume. Aranda testified in his own behalf and denied committing the robbery. He had never owned a .25 caliber nickel-plated automatic gun and had never seen the bullets found in his apartment. His mother, however, picked up a great many things and left them all over the house. He was

---

[2]Some doubt was cast upon these identifications on cross-examination. It appeared that no electric lights were on in the store during the robbery. The witnesses in the police report had described the man holding the gun as younger and heavier than Aranda actually was. They had also identified him in the report as wearing sun glasses and a hat. At trial, both Luna and Salgado were not at all certain whether the man they had seen during the robbery had or had not worn a hat or sun glasses.

at Chaleco's Bar late in the afternoon of the day of the robbery where he met Miss Holbrook, with whom he was slightly acquainted. They left the bar sometime after 8 p.m. to visit Miss Holbrook's boy friend, Luna. On a corner opposite the jewelry store, they met Luna and stopped to talk to him. Luna pointed out the store to Aranda, which was the first time that Aranda saw it. While the three were talking, a police officer came by and called defendant and Miss Holbrook aside to talk to them.[3]

On rebuttal the prosecution called Aranda's mother, who testified that she had not brought the bullets into the house or seen them there. Aranda was also impeached by evidence of three prior felony convictions and testimony of a police officer that on the day of his arrest Aranda denied knowing where the Luna jewelry store was located.

Aranda contends that the error in admitting Martinez's confession into evidence was also prejudicial to him. The Attorney General contends that the error did not prejudice Aranda on the ground that the trial court instructed the jury on several occasions that the confession was to be considered as evidence only against Martinez, the declarant. To hold otherwise, he asserts, would be inconsistent with the rule permitting joint trials in such cases.

This court has consistently held that a joint trial is permissible under Penal Code section 1098 even though the prosecution has obtained a confession from one defendant inculpating both defendants and intends to introduce that confession into evidence (e.g., *People* v. *Ketchel*, 59 Cal.2d 503, 532-533 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Turville*, 51 Cal.2d 620, 636 [335 P.2d 678]; *People* v. *Perry*, 195 Cal. 623, 633 [234 P. 890]). The rationale of these cases is that a jury will comprehend and apply instructions to limit the effect of a confession to the particular declarant. (See *People* v. *Pike*, 58 Cal.2d 70, 85 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Chavez*, 50 Cal.2d 778, 790 [329 P.2d 907]; *People* v. *Isby*, 30 Cal.2d 879, 897 [186 P.2d 405].) In the absence of a showing of some positive act of misconduct

[3] Officer Howard Friar corroborated a part of Aranda's testimony. He stated that he had seen Aranda and Miss Holbrook on the corner adjacent to the jewelry store. Later in the evening he had spoken to Luna. Officer Friar was not asked about any conversation he had with Aranda or whether he had seen Aranda with Luna. Miss Holbrook was not called by either side. The prosecution claimed that it was useless for it to call her, since she had stated that she was unable to identify either of the men who had entered Luna's store. Counsel for Aranda said that she had not been called because he was unable to locate her.

it is presumed that the members of the jury performed their duties with fidelity to their oaths and that they obeyed the admonitions of the judge. (See *People* v. *Turville,* 51 Cal.2d 620, 636 [335 P.2d 678]; *People* v. *Santo,* 43 Cal.2d 319, 332 [273 P.2d 249]; *People* v. *Kramer,* 117 Cal. 647, 649-650 [49 P. 842].)

In *Delli Paoli* v. *United States,* 352 U.S. 232 [77 S.Ct. 294, 1 L.Ed.2d 278], the Supreme Court of the United States approved this rule in joint trials in the federal courts. In justifying its decision, the court said: "It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense." (P. 242.)

To some judges, however, the procedure cannot be justified. It "results in serious impairment of the rights of the accused to a fair consideration by an impartial jury of the competent evidence produced against him." (*People* v. *Fisher,* 249 N.Y. 419, 428 [164 N.E. 336, 339] [Lehman, J., dissenting]; see *People* v. *Buckminster,* 274 Ill. 435, 446-448 [113 N.E. 713, 715-716]; *United States* v. *Delli Paoli* (2d Cir.) 229 F.2d 319, 322 [Frank, J., dissenting].) It is a "fiction" and a "naive assumption" about the way juries can function. (See *Krulewitch* v. *United States,* 336 U.S. 440, 453 [69 S.Ct. 716, 93 L.Ed. 790] [Jackson, J., concurring]; *People* v. *Chambers,* 231 Cal.App.2d 23, 33 [41 Cal.Rptr. 551].) The rule calls upon the jury to perform "a mental gymnastic which is beyond, not only their powers, but anybody's else." (*Nash* v. *United States* (2d Cir.) 54 F.2d 1006, 1007; see Meltzer, *Involuntary Confessions: The Allocation of Responsibility between Judge and Jury,* 21 U.Chi.L.Rev. (1954) 317, 326.) Writing for the four dissenters in *Delli Paoli* v. *United States,* 352 U.S. 232 [77 S.Ct. 294, 1 L.Ed.2d 278], Justice Frankfurter stated: "The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell. . . . The Government should not have the windfall of having the jury be influenced by evidence

against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds." (P. 247.) To these critics, the rule is not basic to our jury system and is not needed to preserve the system. Instead it is a rule that perverts the jury trial since it calls upon ordinary lay people to obey an instruction that every judge realizes cannot be obeyed. It fosters what one scholar refers to as our "inconsistent attitude" toward juries. We treat them "at times as a group of low-grade morons and at other times as men endowed with a superhuman ability to control their emotions and intellects." (Morgan, Some Problems of Proof under the Anglo-American System of Litigation (1956) p. 105.)

■ Whether or not these criticisms of the present rule require its abrogation, a question we consider later herein, they clearly foreclose any assumption that error in admitting a confession that implicates both defendants is rendered harmless to the nonconfessing defendant by an instruction that it should not be considered against him. At best, the rule permitting joint trials in such cases is a compromise between the policies in favor of joint trials and the policies underlying the exclusion of hearsay declarations against one who did not make them.[4] When, however, the confession implicating both defendants is not admissible at all, there is no longer room for compromise. The risk of prejudicing the nonconfessing defendant can no longer be justified by the need for introducing the confession against the one who made it. Accordingly, we have held that the erroneous admission into evidence of a confession implicating both defendants is not necessarily cured by an instruction that it is to be considered only against the declarant. (*People* v. *Gonzales,* 136 Cal. 666, 668-669 [69 P. 487]; see *Greenwell* v. *United States* (D.C. Cir.) 336 F.2d 962, 968-969; *People* v. *Donovan,* 13 N.Y.2d 148, 151 [243 N.Y.S.2d 841, 193 N.E.2d 628]; *People* v. *Waterman,* 9 N.Y.2d 561, 567 [216 N.Y.S.2d 70, 175 N.E.2d 445]; compare *People* v. *Rudish,* 294 N.Y. 500 [63 N.E.2d 77] with *Malinski* v. *New York,* 324 U.S. 401, 410-412 [65 S.Ct. 781, 89 L.Ed. 1029].) ■ The giving of such instructions, however, and the fact that the confession is only an

---

[4]In this compromise the defendant must bear the risk that regardless of its efforts, the jury may subconsciously merge all the evidence. "A man takes some risk in choosing his associates and, if he is hailed into court with them, must ordinarily rely on the fairness and ability of the jury to separate the sheep from the goats." (*United States* v. *Fradkin* (2d Cir.) 81 F.2d 56, 59.)

accusation against the nondeclarant and thus lacks the shattering impact of a self-incriminatory statement by him (see *People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]) preclude holding that the error of admitting the confession is always prejudicial to the nondeclarant.

In the present case, however, it is reasonably probable that a result more favorable to Aranda would have been reached had Martinez's confession been excluded. The error therefore resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) There was a direct conflict in the evidence, and both defendants denied their guilt. In his argument to the jury, the prosecutor linked the cases of the two defendants together and in effect urged Martinez's confession as evidence against Aranda.[5]

Since the judgments must be reversed, we consider other questions that may arise on retrial.

The prosecution may be able to establish that Martinez was informed of his rights to counsel and to remain silent or that he waived those rights before he confessed. In that event, Martinez's confession would be admissible and Aranda might move for a separate trial.[6]

---

[5]After contending that the case against Aranda based on identifications, the finding of cartridges in his home, and his false statement to the police, was a strong one, the prosecutor stated that ''we have one other thing. We have a statement made by Mr. Martinez, a statement made by Mr. Martinez relating to Chaleco's Bar; a statement relating to how the robbery occurred, how they went in there, how he was involved.'' Later the prosecutor stated that in terms of credibility ''basically it is going to boil down to a police officer, Officer Becker, and the two defendants here.'' This was repeated when he said, ''Now, if you wish to believe the defendants, you must also—I urge you to consider this as your credibility. You are saying that the officer is not telling the truth; you are saying that the officer is lying and these two defendants are the ones who are telling the truth.'' The jury was told that ''we have a confession or an admission on the part of one of the defendants—that the officer said that Mr. Martinez stated that on the way home they decided to rob Luna's store. Afterward—that they robbed the store, and afterward they ran to Chaleco's Bar.'' Finally, to give relevance to Luna's testimony about the odor of the rope used to bind him, the prosecution stated that Martinez had admitted that ''the reason it had a sweet smell is because Chop Chop carried it in his shaving kit.'' In view of this summation, it is highly unlikely that the jury could have disregarded Martinez's confession when it decided the question of defendant Aranda's guilt or innocence.

[6]Defendant Aranda, both in discovery proceedings and on a motion for a new trial, contended that he was entitled to see any memoranda that the police had of extrajudicial statements made by Martinez. Although the record is unclear as to the actual existence of such memoranda, the trial court erred in holding that, in any event, Aranda was

It is contended that it is a denial of due process to admit into evidence at a joint trial the confession of one defendant inculpating a codefendant even though the jury is instructed that the confession is not to be considered against the codefendant. In *Jackson* v. *Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R. 3d 1205], the United States Supreme Court held that a defendant was constitutionally entitled to have a trial judge or possibly a separate jury determine that his confession was voluntary before it was submitted to the trial jury for an assessment of its credibility. The court did not believe that a jury could separate the issue of the voluntariness of an extrajudicial statement from the issue of its truth. "If there are lingering doubts about the sufficiency of the other evidence, does the jury unconsciously lay them to rest by resort to the confession? Will uncertainty about the sufficiency of the other evidence to prove guilt beyond a reasonable doubt actually result in acquittal when the jury knows the defendant has given a truthful confession.

"It is difficult, if not impossible, to prove that a confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is the course it took, was affected by other evidence showing the confession was true." (Pp. 388-389.) It quoted from Justice Frankfurter's dissent in *Delli Paoli* to the effect that a jury should not be permitted to be influenced by evidence against a defendant that as a matter of law they cannot consider but as a matter of fact they cannot disregard, and cited Morgan, Some Problems of Proof under the Anglo-American System of Litigation (1956) pages 104-105, to the same effect.

Although *Jackson* was directly concerned with obviating any risk that a jury might rely on an unconstitutionally obtained confession in determining the defendant's guilt, its logic extends to obviating the risks that the jury may rely on any inadmissible statements. If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's

not entitled to discover statements made by Martinez. ▮▮▮▮ As a preliminary to a joint trial, one defendant is entitled to the statements made to the police by any codefendant. (See generally *People* v. *Garner,* 57 Cal.2d 135, 142 [18 Cal.Rptr. 40, 367 P.2d 680]; *Funk* v. *Superior Court,* 52 Cal.2d 423, 424 [340 P.2d 593].) Without such information, a defendant, such as Aranda, would be unable to take the steps needed to insure that the confessions of his codefendants would be used only to incriminate those who made the statements.

confession implicating another defendant when it is determining that defendant's guilt or innocence.[7]

Indeed, the latter task may be an even more difficult one for the jury to perform than the former. Under the New York procedure, which *Jackson* held violated due process, the jury was only required to disregard a confession it found to be involuntary. If it made such a finding, then the confession was presumably out of the case. In joint trials, however, when the admissible confession of one defendant inculpates another defendant, the confession is never deleted from the case and the jury is expected to perform the overwhelming task of considering it in determining the guilt or innocence of the declarant and then of ignoring it in determining the guilt or innocence of any codefendants of the declarant. A jury cannot "segregate evidence into separate intellectual boxes." (*People* v. *Chambers,* 231 Cal.App.2d 23, 33 [41 Cal.Rptr. 551].) It cannot determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A.

In section 1098 of the Penal Code, the Legislature, while providing that the courts might order separate trials for defendants jointly charged with any public offense, left to the courts the determination of standards governing such severances. ▇▇▇ The grave constitutional doubts[8] engendered by

---

[7] "Because of these close parallels between *Jackson* and *Delli Paoli, Jackson* may foreshadow a holding that the *Delli Paoli* procedure violates due process." (78 Harv.L.Rev. 211, 213; see *People* v. *Clark,* 62 Cal.2d 870, 885, fn. 13 [44 Cal.Rptr. 784, 402 P.2d 856].)

[8] In *Pointer* v. *Texas,* 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923], the Supreme Court held that the Fourteenth Amendment made the Sixth Amendment's guarantee of a defendant's right "to be confronted with the witnesses against him" including the right to cross-examine these witnesses applicable to the states. More specifically, it found that when the prosecution in a criminal trial introduced the prior testimony of a witness who had not been subject to effective cross-examination at a preliminary hearing where this testimony was taken, defendant's constitutional right of confrontation was violated. The court quoted with approval from *Turner* v. *Louisiana,* 379 U.S. 466, 472-473 [85 S.Ct. 546, 13 L.Ed.2d 424]: "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination and of counsel." In reaching its decision that the Sixth Amendment's right of confrontation applies to trials in state courts, the court noted that any statements to the contrary in *West* v. *Louisiana,* 194 U.S. 258, 264 [24 S.Ct. 650, 43 L.Ed. 965], and in *Stein* v. *New York,* 346 U.S. 156, 195-196 [73 S.Ct.

our present practice of permitting joint trials when the confession of one defendant implicates codefendants has prompted our reconsideration of this practice. Whether or not it is constitutionally permissible, the practice is prejudicial and unfair to the nondeclarant defendant and must be altered.

■ "[I]n criminal actions, where life or liberty is at stake, courts should not adhere to precedents unjust to the accused. It is never too late to mend." (*United States* v. *Delli Paoli* (2d Cir.) 229 F.2d 319, 323 [Frank, J., dissenting].)

■ In the absence, however, of a holding by the United States Supreme Court that the due process clause requires such change, the rules we now adopt are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement section 1098.[9]

■ When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established.[10]

---

1077, 97 L.Ed. 1522], could no longer be regarded as law. In *Stein,* the court found that the right of confrontation was not binding on the states and affirmed the conviction of a defendant who had been implicated by the confessions of his codefendants. The confessions had been admitted with the instruction that they were to be considered only against their respective declarants.

It is not clear what other procedural practices *Pointer* precludes. It at least casts further doubt, however, on any rule that purports to cure an encroachment on the right to confrontation by an instruction to the jury to disregard inadmissible hearsay evidence. (See generally *Salinger* v. *United States,* 272 U.S. 542, 548 [47 S.Ct. 173, 71 L.Ed. 398]; *Kirby* v. *United States,* 174 U.S. 47, 55 [19 S.Ct. 574, 43 L.Ed. 890].)

[9]In justification of joint trials it has been pointed out that they conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in the punishing of a defendant. These practical considerations of convenience must be subordinated when they run counter to the need to insure fair trials and to protect fundamental constitutional rights. (See *Kotteakos* v. *United States,* 328 U.S. 750, 773 [66 S.Ct. 1239, 90 L.Ed. 1557]; *Schaffer* v. *United States,* 362 U.S. 511, 522-523 [80 S.Ct. 954, 4 L.Ed.2d 921] [Douglas, J., dissenting].)

[10]The rules governing the cases in which deletion would be a permissible alternative cannot be set out fully. Use of the procedure would depend on the evidence linking the defendants together before and after the crime and on the actual statements made by the declarant defendant.

In the present case, deletion would have been an effective solution to the joint trial problem. All that Martinez's confession added to the

(2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made.  (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible.  Similar rules concerning joint trial have been adopted in other jurisdictions and have been found workable.  (See, e.g., *State* v. *Castelli,* 92 Conn. 58 [101 A. 476] ; *People* v. *Barbaro,* 395 Ill. 264 [69 N.E.2d 692] ; *People* v. *Bolton,* 339 Ill. 225 [171 N.E. 152] ; *State* v. *Rosen,* 151 Ohio St. 339 [86 N.E.2d 24].)

■ Defendant Aranda objects to the introduction into evidence of proof of two prior felony convictions.  On March 30, 1955, he was convicted of violating section 503 of the Vehicle Code, and on March 21, 1957, of violating section 11500 of the Health and Safety Code.  After these convictions, he was committed to the California Youth Authority.  Section 17 of the Penal Code then provided in part: ''Where a court commits a defendant to the California Youth Authority upon conviction of a crime punishable by imprisonment in the state prison or fine or imprisonment in a county jail, in the discretion of the court, the crime shall be deemed a felony until and unless the court, after the person . . . has been discharged . . . makes an order determining that the crime of which he was convicted was a misdemeanor.''  Aranda does not contend that, after his discharge from the Youth Authority, he made application for or obtained court orders determining that the crimes of which he had been convicted were misdemeanors.  In 1959, section 17 was amended (Stats. 1959, ch. 532, at p. 2499) so that it now reads: ''Where a court commits a defendant to the Youth Authority upon conviction of a crime punishable, in the discretion of the court, by imprisonment in the state prison or fine or imprisonment in a county jail, the crime shall be deemed a misdemeanor.''

There is no merit in Aranda's contention that this amendment must be given a retroactive application and that if it is only applied prospectively, he will be deprived of due

case against Aranda was Aranda's identity. No evidence linked the two together at any other time relevant to the commission of the robbery. Deleting all references to Aranda would not have prejudiced Martinez and what remained would have prejudiced Aranda no more than if Martinez had in fact said that ''I was one of the persons who robbed the store but I will tell you nothing more.''

532

process of law and of the equal protection of the law. Section 3 of the Penal Code provides that ''No part of it is retroactive, unless expressly so declared.'' (See also *Douglas Aircraft Co.* v. *Cranston,* 58 Cal.2d 462, 465 [24 Cal.Rptr. 851, 374 P.2d 819] ; *Corning Hospital Dist.* v. *Superior Court,* 57 Cal.2d 488, 494 [20 Cal.Rptr. 621, 370 P.2d 325].) The amendment to section 17 does not so declare. (See *People* v. *Zaccaria,* 216 Cal.App.2d 787 [31 Cal.Rptr. 383] ; *People* v. *Gotham,* 185 Cal.App.2d 47 [8 Cal.Rptr. 20].) █ A refusal to apply a statute retroactively does not violate the Fourteenth Amendment.

Both defendants contend that the evidence does not support findings that they were guilty of first degree robbery or that they were armed with a deadly weapon. █ Section 211a of the Penal Code provides that robbery ''perpetrated . . . by a person being armed with a dangerous or deadly weapon'' is robbery in the first degree. The words ''dangerous or deadly'' are used disjunctively and are not equivalents. (See *People* v. *Seawright,* 72 Cal.App. 414, 419 [237 P. 796] ; *State* v. *Lynch,* 88 Me. 195, 197-198 [33 A. 978, 979].) Thus, it is not necessary to show that the weapon is deadly so long as it can be shown that it is dangerous. (*People* v. *Coleman,* 53 Cal.App.2d 18, 28 [127 P.2d 309].) █ When the weapon involved is a gun, the prosecution need not produce it. Testimony by witnesses who state that they saw what looked like a gun, even if they cannot identify the type or caliber, will suffice. (*People* v. *Miller,* 190 Cal.App.2d 361, 364 [11 Cal.Rptr. 920] ; *People* v. *Mack,* 171 Cal.App.2d 631, 632 [341 P.2d 334] ; *People* v. *Billingsley,* 161 Cal.App.2d 247, 250-251 [326 P.2d 642].) █ The prosecution does not have to prove either that the gun was loaded (*People* v. *Raleigh,* 128 Cal.App. 105, 108 [16 P.2d 752] ; *People* v. *Egan,* 77 Cal.App. 279, 284 [246 P. 337]) or that it was real (*People* v. *Ward,* 84 Cal.App.2d 357, 360 [190 P.2d 972]). Any pistol, even a short one, may be a ''dangerous'' weapon within the meaning of the statute since it is capable of being used as a bludgeon. (See *People* v. *Hood,* 160 Cal.App.2d 121, 122 [324 P.2d 656].) █ It is not necessary to show that defendant intended to use it. (*People* v. *Raleigh,* 128 Cal.App. 105, 110 [16 P.2d 752].) █ A jury may be instructed that if it finds that the gun was real, whether loaded or not, then the crime committed is robbery in the first degree. If it finds that the gun was a toy, it may still find that the robbery is of the first degree if it determines from the circumstances that the toy gun could have been used as a club.

■ Section 3024, subdivision (b), of the Penal Code provides that a person with a prior felony conviction is subject to a minimum sentence of four years if at the time of the offense he was "armed with a deadly weapon." The disjunctive word "dangerous" is not used, but the words "deadly weapon" are defined in subdivision (f) to include "any . . . pistol, revolver, or any other firearm . . . and any metal pipe or bar used or intended to be used as a club." Although this definition includes any firearm whether loaded or not, it does not include a toy pistol unless the toy was made of metal and was "used or intended to be used as a club." ■ If the weapon cannot be found, the jury may be instructed by the court that it may draw an inference from the circumstances surrounding the robbery that the gun was not a toy. ■ Testimony to the effect that the defendant was flourishing the pistol or pointing it at the victim and was using threatening words or conduct indicating that he intended to fire it if his demands were not met would be evidence from which the inference could be drawn. (Cf. *People* v. *Newman*, 102 Cal.App.2d 302, 306-307 [227 P.2d 470]; *People* v. *Seawright*, 72 Cal.App. 414, 419 [237 P. 796].)

Since other questions raised are not likely to arise on retrial, we need not decide them here.

The judgments are reversed.

Peters, J., Tobriner, J., Peek, J., Burke, J., and White, J.,* concurred.

McCOMB, J., Concurring and Dissenting.—I concur in the reversal of the judgment as to defendant Martinez. I would affirm the judgment as to defendant Aranda.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.