[No. B196415. Second Dist., Div. Seven. Jan. 23, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LEO ANTHONY REYES et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III through VII.

**COUNSEL**

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant Leo Anthony Reyes.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Sergio Ginez.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kenneth N. Sokoler and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WILEY, J.[*]—On a summer day near the beach, a Mercedes pulled next to a Camaro. The Mercedes's passenger said, "Where you from, ese?," and started shooting, killing two in the Camaro and wounding a third. Police forecast the escape route and intercepted Sergio Ginez and Leo Anthony Reyes in flight. A jury convicted them of murder and other charges and they appeal. We affirm, except we order that Ginez's abstract of judgment be corrected to conform to the sentence the trial court actually imposed.

I

The shooting was near a police substation a block and a half from Venice Beach. The Venice 13 gang claims this territory, testified gang expert Gerald Gibson. Gibson said Ginez and Reyes were active members of the Culver City Boys (CCB) gang, which is a rival of Venice 13. Both gangs apparently are Hispanic. Gibson said the three victims in the Camaro were not gang members.

The gang colors of red and blue figure in the evidence. Venice 13's color is blue. CCB's is red. Reyes owned the Mercedes, which was reddish— burgundy or maroon. Reyes drove and Ginez rode. Ginez wore a red bandana headband. Reyes drove up to the parked Camaro, which was blue. Surviving victim Juan Cortez, who was 21 at the time, was in the Camaro with Victor Rodriguez and Jose Acosta. Cortez wore blue shorts, a blue shirt, and a blue hat.

Cortez heard someone say, "Where you from, ese?" Cortez knew the question was about gangs. He looked left and saw Ginez holding a gun. He was about to say, "I don't bang," meaning "I'm not in a gang." Ginez opened fire without waiting for more words. He shot 15 bullets into the Camaro. Five hit Cortez. When the shooting stopped, Cortez asked his friend Rodriguez "Are you okay?," but Rodriguez was leaning in his seat throwing up blood and did not say anything. Acosta was in the front passenger seat, trying to

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

open the door. Police arrived three or four minutes after the shooting. Rodriguez and Acosta died at the scene.

Victims Cortez, Rodriguez, and Acosta were not Venice 13 members. Ginez took them for Venice 13 because they were young Hispanic men showing blue on Venice 13 soil. So he shot them all.

The 911 call went out swiftly on this summer Sunday. Two officers heard the broadcast shooting address and figured the likely escape route. They aimed to "set our vehicle up on top of the 90 freeway." They backed up the Centinela Avenue off-ramp onto the eastbound freeway. "Within one to two seconds" they saw a car matching the radio description. It was a 2004 maroon Mercedes-Benz. It had no rear license plate. Freeway traffic was light and Reyes accelerated to 80 as police followed. He went south onto the 405 freeway and exited at La Tijera, where police pulled Reyes and Ginez over. Police had followed them for a total of only two or three minutes.

Police ferried witnesses from Venice to the La Tijera scene for a field showup. The witnesses identified Ginez, Reyes, and the Mercedes. Wounded victim Cortez went straight to the hospital, but later picked Ginez from a six-person photo display, and then identified him again at the preliminary hearing and at trial. When police searched the Mercedes, they found a red bandana. In the glove box were four live cartridges in a sock. The four cartridges matched the nine-millimeter caliber and the branding of the 15 nine-millimeter shells left at the shooting scene. Police found no gun.

The jury convicted Ginez of two counts of first degree murder (Pen. Code, § 187, subd. (a); counts one and two; all further undesignated section references are to the Penal Code), premeditated attempted murder (§§ 664, subd. (a), 187, subd. (a); count three), shooting at an occupied vehicle (§ 246; count five), and possessing a firearm as a felon (§ 12021, subd. (a)(1); count six). (There was no count four.) The jury also found true allegations that, on counts one and two, Ginez committed multiple murders (§ 190.2, subd. (a)(3)), intentionally fired from a motor vehicle intending to kill (§ 190.2, subd. (a)(21)), and personally discharged a firearm causing death (§ 12022.53, subd. (d) and (e)(1)); on count three, he personally discharged a firearm causing great bodily injury; and on all counts, he committed the crimes to benefit a gang (§§ 12022.53, subds. (d), (e)(1)), 186.22, subd. (b)(1)(A)).

The jury convicted Reyes of two counts of second degree murder as a lesser crime (§ 187, subd. (a); counts one and two), attempted murder (§§ 664, 187, subd. (a); count three), and shooting at an occupied vehicle (§ 246; count five). (Reyes was not charged in count six.) The jury also found

true allegations that, on counts one, two, and three, a principal had discharged a firearm causing death or great bodily injury, and on all counts, Reyes committed the crimes to benefit a gang. (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)(1)(A).)

The court sentenced Ginez to two consecutive life without parole terms plus 70 years for the two murders and their enhancements, and stayed or made concurrent terms on all other counts. The court sentenced Reyes to 40 years to life on the count one murder and gun use enhancement and stayed or made concurrent the terms on all other counts.

## II

The only substantial issue on appeal is an *Aranda/Bruton* question. We assume there was error and hold it harmless beyond a reasonable doubt.

Three factors raise the *Aranda/Bruton* question. There were two defendants tried together. Reyes spoke to police in a way that could incriminate Ginez. (We will recount this statement in a moment.) And Ginez could not cross-examine Reyes because Reyes did not testify.

At trial and outside the jury's presence, Ginez objected to the prosecution's plan to introduce Reyes's statement to police. Ginez argued this statement would implicate him in the crimes and to admit it in a joint trial where Reyes would not testify would violate *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. The court overruled the objection, ruling that the statement was admissible as to Reyes and inadmissible as to Ginez. The court instructed the jury not to consider the statement against Ginez. Ginez renews his objection on appeal.

This evidence issue presents a difficult question because the true meaning of Reyes's statement to police is debatable. The prosecution may well have offered this statement for its truth. It depends on what the true meaning is. We must interpret Reyes's words to determine their meaning. Only then can one tell if the prosecution offered these words for the truth of this meaning. If the prosecution offered the words for some other purpose, there is no hearsay and no *Aranda/Bruton* problem.

The starting point is the text and context of Reyes's statement. The police stopped Reyes's Mercedes at La Tijera and got Reyes and Ginez out of the car. Officer Rodrigo Rodriguez detained Reyes in a patrol car while waiting for witnesses to arrive from Venice Beach for the field showup. (We call Officer Rodrigo Rodriguez by his full name to distinguish him from shooting

victim Victor Rodriguez.) Reyes spontaneously asked Rodrigo Rodriguez three questions. First Reyes asked what was going on. Rodrigo Rodriguez told him the vehicle Reyes was driving was involved in a crime. Second, Reyes asked what kind of crime was involved. Rodrigo Rodriguez replied that a shooting had occurred with the vehicle Reyes was driving described in the shooting. Third and crucially Reyes asked, *"Well, if you don't find the gun, then you are going to let us go, right?"* (Italics added.) No one said anything more.

The Attorney General now says "[t]here were no statements of fact made by appellant Reyes, and nothing he said to Officer Rodriguez was offered for the truth of the statements. . . . *It is simply not possible to assert the truth of a question."* (Italics added.) The Attorney General concludes there was no hearsay.

■ This argument is unpersuasive. Some questions actually are statements. Doubters might watch a cross-examination or an appellate argument. Questions sometimes conceal statements only thinly. And the statements the questions imply can be clear and powerful: "You are lying." "Your argument fails." Mueller and Kirkpatrick write that questions indeed can make "claims about events and conditions when subjected to everyday interpretive conventions. And such utterances express and communicate ideas, quite apart from whatever concrete facts they convey. Hence they should be viewed as 'statements' for purposes of the hearsay doctrine." (Mueller & Kirkpatrick, Modern Evidence: Doctrine and Practice (1995) § 8.4, p. 1057; see also *People v. Hill* (1992) 3 Cal.4th 959, 989–990 [13 Cal.Rptr.2d 475, 839 P.2d 984], disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; *Stoddard v. State* (2005) 389 Md. 681, 709 [887 A.2d 564, 581].) The Attorney General offers no authority for the claim that statements cannot come in the form of a question. We reject the notion that a question can never be a statement. Rather, context is important to interpret meaning accurately.

The Attorney General also says Reyes's "questions were relevant because it seems suspicious that someone would choose to ask about the missing gun if he was actually totally unconnected to the shooting." We agree: Reyes's words about the gun were extremely suspicious. Why, exactly? We look to the prosecution's theory of the case.

The prosecution theory was Ginez fired a gun at the crime scene but had no gun when arrested. So he must have dumped the gun somewhere between Venice Beach and La Tijera. Little time had passed, so this goal must have been a priority for the fleeing Ginez and Reyes: *dump the gun.* Ginez and Reyes accomplished that goal. But soon police nab Ginez and Reyes, and

Reyes blurts out, "Well, if you don't find the gun, then you are going to let us go, right?" As the prosecutor told the jury: "Defendant Reyes's statement even to Officer Rodriguez, 'Hey, if you don't find the gun you're going to let us go.' Again, pointing to his knowledge." What knowledge? A reasonable candidate for an inference is the prosecution wanted the jury to believe Reyes blurted out the truth: "you won't find the gun because Ginez just dumped it." So it may be reasonable to interpret Reyes's question as an implied statement that "Ginez just dumped the gun."

This candidate for an interpretation seems reasonable even though it is the opposite of what Reyes would plan to say to police. People make revealing slips all the time. You are introduced to someone with a prominent nose wart and are mortified to hear yourself say "Hello, Mr. Wart." A wife calls her husband by a different man's name. "As a common pun goes, 'A Freudian slip is like saying one thing, but meaning your mother.' " (Wikipedia <http://en.wikipedia.org/wiki/Freudian_slip> [as of Jan. 23, 2008].) Words continually give us glimpses into active and anxious minds.

This meaning of Reyes's statement—"Ginez just dumped the gun"—would be implied rather than express. The problem of implied assertions in the law of hearsay is venerable and complex. (See, e.g., *People v. Morgan* (2005) 125 Cal.App.4th 935, 937–946 [23 Cal.Rptr.3d 224]; *Stoddard v. State, supra,* 389 Md. at pp. 687–712 [887 A.2d at pp. 568–582]; *State v. Dullard* (Iowa 2003) 668 N.W.2d 585, 590–598.) "The starting point for a discussion of the implied assertion doctrine is the English case of *Wright v. Doe d. Tatham,* 112 Eng. Rep. 488 (Exch. Ch. 1837) and 47 Rev. Rep. 136 (H.L. 1838)." (*Stoddard v. State, supra,* 389 Md. at p. 691 [887 A.2d at p. 570].) One California case holds the hearsay rule should exclude an implied statement—at least in one setting. (*People v. Hill, supra,* 3 Cal.4th at pp. 988–990.)

This issue about the proper treatment of Reyes's implied assertion is critical. If we interpret Reyes's statement as the implied assertion "Ginez dumped the gun," then there may well have been error in the trial court. The trial judge allowed the jury to hear the evidence, telling jurors it was admissible as to Reyes but not Ginez. *Bruton* invalidated this procedure. (*Bruton v. United States, supra,* 391 U.S. at pp. 129–130 [quoting Chief Justice Traynor's opinion in *People v. Aranda, supra,* 63 Cal.2d at pp. 528–529].)

The current briefing does not begin to assist us with the proper treatment of Reyes's implied assertion. The Attorney General cites just one case. It is about a *false* statement. (See *People v. Crew* (2003) 31 Cal.4th 822, 841 [3 Cal.Rptr.3d 733, 74 P.3d 820].) But the prosecution may have wanted the jury

to conclude Reyes said something incriminatingly *true* when he volunteered his gun comment: "Ginez just dumped the gun." So the case about the false statement seems inapposite.

Because the proof was powerful but briefing is not, we will assume there was an *Aranda/Bruton* error. The proof of guilt was overwhelming, so any error from Reyes's statement was harmless beyond a reasonable doubt. The police captured the fleeing shooters in the area of the crime, speeding away on the predictable and predicted escape route. Thus there was proximity of time and place. Three eyewitnesses (Juan Cortez, Don Jordan, and Cesar Garnica) saw Ginez in noon light at close range and repeatedly identified him as the shooter. Two of those witnesses apparently were Hispanic, reducing any cross-racial infirmities in their identifications. Despite the defense's attack on the reliability of the identifications, police spotted Reyes's distinctive car almost immediately, pursued and stopped it, and arrested Reyes and Ginez, its only occupants. The witnesses identified Reyes's car as the one from which Ginez fired the shots. Nothing suggested anyone entered or left the car between the shootings and the arrests.

The gang elements match up. The shooting followed the shooter's gang challenge, "Where you from, ese?" Reyes and Ginez were together, and they both had gang tattoos for the same gang. There was no nongang person in the car. Their gang was a rival to the gang claiming the shooting area. The colors matched up. The car had no rear license plate, consistent with gang attack planning.

The Mercedes's interior contained earmarks of guilt. There was the bandana, matching the witness description from the crime scene. There was the sock of live cartridges. Few drivers carry live cartridges in a sock in the glove compartment, even in Los Angeles. The only use for cartridges is in a gun, and this was a gun crime. The nine-millimeter *caliber* was a match between the casing at the crime scene and the cartridges in the Mercedes. The cartridge *manufacturers* matched up. The evidence was that many different manufacturers make many different brands of nine-millimeter cartridges. The branding from the cartridges in the glove compartment matched the casings from the crime scene.

■ Beyond a reasonable doubt, Reyes and Ginez were the perpetrators. The brief testimony about Reyes's statement and the prosecutor's passing mention were no more than harmless error.

III–VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 214.

## DISPOSITION

As to Reyes, we affirm the judgment. As to Ginez, we affirm the judgment, but we remand the case to the trial court with directions (1) to prepare an amended abstract of judgment that deletes the fine under section 1202.45 and (2) to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

Perluss, P. J., and Zelon, J., concurred.

A petition for a rehearing was denied February 19, 2008, and on January 25, 2008, and February 14, 2008, the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied April 30, 2008, S161066.