Filed 2/2/16  P. v. Cabrillo CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL CARRILLO, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B252171<br>(Super. Ct. No. 2007032701)<br>(Ventura County) |

A jury found Paul Carrillo, Jr. guilty of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  The jury also found true that Carrillo was a principal in the offense and that at least one principal discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and that the firearm was discharged from a motor vehicle (§ 190.2, subd. (a)(21)).  The jury also found two gang allegations true.  (§§ 186.22, subd. (b)(1), 190.2, subd. (a)(1).)  The trial court sentenced Carrillo to life in state prison without the possibility of parole.

We strike the parole revocation fine imposed by the trial court. (§ 1202.45.)  In all other respects, we affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

FACTS

When Edgar Flores was a teenager, he was associated with the 12th Street Locos gang. After he married in 2004, he did not associate with any gang. His wife, Maricela, testified she never saw Flores with a gun, and they did not have one in their house.

Flores and his family lived on Ferris Drive in Santa Paula. Ferris Drive is a rural road that dead ends at railroad tracks. There is little traffic on the street, and it is mainly used by people who live there.

On August 24, 2007, some relatives and friends of Flores met at his home. Included in the group were Flores's brother, Ronnie, and their cousin, Victor. The men stayed in the front yard visiting with Flores.

At about 3:00 p.m., Ronnie and Victor left in Victor's truck to buy some pizza to bring back to the house. As they were stopped at a traffic light, Ronnie saw a black GMC pickup truck stopped on the opposite side of the intersection. Miguel Gonzalez was driving the truck. Victor and Ronnie had known Gonzalez since childhood. Manual Rodriguez was in the passenger seat. As the trucks passed in the intersection, Rodriguez was "mad-dogging" Victor; that is, giving him threatening looks. Ronnie and Victor returned to Flores's house.

At about 4:00 p.m., Carrillo entered a sporting goods store and purchased .380-caliber Winchester ammunition. The clerk put the ammunition in a Big 5 Sporting Goods plastic bag.

At about 5:00 p.m., at Flores's house, the men were in the front yard eating pizza and drinking beer. The black truck drove down Ferris Drive, past Flores's house, made a U-turn and drove back. The truck stopped by Flores's driveway with the windows rolled down. Victor saw Gonzalez and Rodriguez in the truck. They asked one of the men from the party who owned the truck in the driveway, then they drove away.

Victor told Flores that the men in the black truck were members of the Bad Boyz gang. Flores took his children inside the house.

2

A few minutes later, the black truck drove down Ferris Drive past Flores's house again. The truck turned around and stopped near Flores's driveway. The back passenger window was rolled down. Carrillo was sitting in the passenger seat.

Carrillo asked one of the men at the party where he was from. The man understood Carrillo to mean what gang does he belong to. The man said he was not a gang member. The truck then moved in front of Flores's driveway.

Flores walked down his driveway toward the black truck. He had his hands in the air. He may have been holding a beer in one hand. He did not have either hand in his pocket and he was not carrying a weapon.

As Flores approached the truck, he asked Carrillo why he was disrespecting his house. He said his children and family lived there. Flores still had his hands raised.

Carrillo said he was not disrespecting anyone. Then he said, "This is Bad Boyz gang." He raised a handgun, extended his arm out the window and fired seven shots directly at Flores. Flores fell to the ground. As the black truck sped away, Carrillo yelled, "Bad Boyz gang." Flores died at the scene.

Sheriff's officers arrived within 15 minutes of the shooting. Victor identified Carrillo as the shooter, Gonzalez as the driver, and Rodriguez as a passenger.

The next morning sheriff's deputies executed search and arrest warrants at Carrillo's house. Carrillo, Gonzalez and Rodriguez were present and were arrested.

Deputies searched the black truck found in Carrillo's garage. They found a box of Winchester .380-caliber ammunition and four shell casings inside the truck. They also found a Big 5 Sporting Goods plastic bag and a receipt for the ammunition.

Deputies also searched a white truck parked in front of Carrillo's house. The previous night during surveillance deputies had seen a man leave Carrillo's garage, enter the white truck and return to the garage. During the search, deputies found a .380-caliber handgun. Forensic analysis showed the handgun fired the shots that killed Flores.

Thomas Mendez, an investigator with the district attorney's office, testified as a gang expert. He said Carrillo and Rodriguez are members of the Bad Boyz gang.

3

Some of the primary criminal activities of the gang are firearms possession, shootings and murders. Gang members equate fear with respect and commit violent crimes to cause fear. The question "where are you from" is a challenge, and is typically followed by a violent response. The gang member who asks the question typically has decided on an action before the encounter occurs. A gang member may shout his gang's name during the commission of a crime to spread fear and intimidate rival gangs. In Mendez's opinion, the shooting was committed in association with and for the benefit of the Bad Boyz gang.

Defense

Carrillo did not testify on his own behalf or introduce any other evidence, but elected to stand on the state of the evidence.[2]

DISCUSSION

I

Carrillo contends the trial court erred when it ruled Gonzalez's testimony at a prior trial inadmissible.

At the first trial, the People called Gonzalez as a witness. Gonzalez had agreed to testify as part of a plea agreement. Shortly after Gonzalez began his testimony, the court became concerned that the People might elicit from Gonzalez hearsay statements admissible against Carrillo but not against his codefendant Rodriguez. That would violate the *Aranda/Bruton* rule. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.) The People sought to admit the statements against both defendants on the ground they were coconspirators. (Evid. Code, § 1223, subd. (a).) The trial court held a hearing pursuant to Evidence Code section 402 on the question of conspiracy.

At the section 402 hearing, Gonzalez testified as follows: On the day of the shooting, he was driving Carrillo and Rodriguez around in his truck. Carrillo stated three times that "he felt like smoking someone that day." "Smoking someone" means to shoot

---

[2] The trial court granted codefendant Rodriguez's motion for judgment of acquittal.

4

and kill someone. Carrillo purchased ammunition and they went target shooting. Later in the day, they were driving around when a police car appeared behind them. They turned onto Ferris Drive to avoid the police. They saw members of the 12 Street Locos, a rival gang, at Flores's house. They drove by the house, made a U-turn and drove back to the house. Carrillo put on some black gloves and told Rodriguez to hand him the gun. Flores walked down the driveway toward them. Carrillo said they were not disrespecting Flores's house. Flores continued walking toward them. Carrillo lifted the gun and fired multiple shots at Flores.

On cross-examination, by codefendant Rodriguez's counsel, Gonzalez testified as follows:

"Q  Describe what Edgar Flores was doing as he walked up.

"A  He was just saying how come you are disrespecting my house.

"Q  What was in his hands?

"A  He had a beer can in one and his left hand was in his pocket.

"Q.  Were you concerned about his left hand being in his pocket? [¶] . . . [¶]

"[A]  Yes.

"Q  . . . What was your concern?

"A  I thought he might have a gun.

"Q  Did you say anything to anybody about that?

"A  No.

"Q  Did anybody make a comment that he's strapped, anything like that, that he has a gun?

"A  No.

"Q  How close before the shooting occurred did Mr. Flores get to the car, truck?

"A  From my view point, he got close enough to where I could no longer see below his waist."

On cross-examination by Carrillo's counsel, Gonzalez testified as follows:

5

"Q From your vantage point in the position that you were in the driver's seat, you not only heard Mr. Flores but it was loud enough that it caught your attention to look in the direction?

"A Yes.

"Q And he was walking, right?

"A Right.

"Q He was walking directly at the truck?

"A Right.

"Q Describe the way he was walking.

"A Well, he was holding a beer can in one hand and his left hand was in his shorts pocket.

"Q Why did that cause you concern, if any? Let me put the question about the pocket.

"A Why did it cause me concern?

"Q Yeah.

"A Well, because the way he had his hand in there, it seemed like he -- I don't know if he had a gun but he wanted us to think -- it made me feel like he had a gun."

The next court day the People informed the trial court that they had received information that led them to believe Gonzalez was not being truthful in his testimony. Based on that disclosure and an unrelated discovery violation, Carrillo moved for a mistrial. The People did not oppose the motion and the trial court declared a mistrial.

Prior to the instant trial, the People withdrew their plea agreement with Gonzalez. Gonzalez asserted his Fifth Amendment right against self-incrimination. At the instant trial, Carrillo sought to introduce the transcript of Gonzalez's testimony at the section 402 hearing into evidence under Evidence Code section 1291. The People and Rodriguez opposed the motion. The trial court denied the motion.

6

Carrillo relies on Evidence Code section 1291, subdivision (a)(1). That subdivision provides in part: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion . . . ."

Here Carrillo wanted admitted into evidence Gonzalez's testimony that Flores had his hand in his pocket as he approached the truck. That testimony was offered into evidence by Rodriguez and Carrillo on cross-examination. Thus, it was not "offered against the person who offered it in evidence." Instead, it was offered for Carrillo, the person who offered it into evidence. In order for the testimony that Flores had a hand in his pocket to qualify for admission under Evidence Code section 1291, subdivision (a)(1), it would have had to have been offered by the People. It was not.

Thus, in *People v. Rice* (1976) 59 Cal.App.3d 998, 1005-1006, the court held that a prosecution witness's prior testimony elicited by the defendant on cross-examination did not qualify as a hearsay exception under Evidence Code section 1291, subdivision (a)(1) because the testimony was not originally offered by the People.

Carrillo attempts to distinguish *Rice* on the ground that there the former testimony was given in an unrelated case; whereas here the testimony was given in the same case. But the point is that the prior testimony was not offered against the person who offered it into evidence. Whether the prior testimony was given in the same case or an unrelated case is beside the point under Evidence Code section 1291, subdivision (a)(1). The trial court properly excluded the evidence.

II

Carrillo contends the trial court erred when it refused his request for an imperfect self-defense instruction.

The trial court gave a murder instruction. It also gave a perfect self-defense instruction. The court stated it was giving a perfect self-defense instruction for two reasons. First, the murder instruction mentions a non-justified killing and the court

7

wanted the jury to understand what justification means. Second, Carrillo was trying to develop evidence of self-defense on cross-examination. The court added, however, that there was no evidence Carrillo had the right to use any force, much less deadly force. The court declined Carrillo's request for an imperfect self-defense instruction.

An imperfect self-defense instruction would have informed the jury that what would have been murder is reduced to voluntary manslaughter if the defendant acted in imperfect self-defense. (CALCRIM No. 571.) In imperfect self-defense, the defendant's belief in the need to use deadly force need not be reasonable, but the defendant must actually have a belief in such need. (*Ibid.*)

An instruction need only be given if there is substantial evidence to support it. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1327.) Moreover, imperfect self-defense cannot be invoked by a defendant whose own wrongful conduct brought about the perceived need to kill. (*People v. Booker* (2011) 51 Cal.4th 141, 182.)

The uncontradicted evidence is that on the day of the murder Carrillo purchased ammunition of the type used in the shooting. Later, he drove by Flores's house with a fellow gang member several times. Flores's house is on a little-used dead end street. Shortly before the shooting, Carrillo challenged one of Flores's friends by asking where he was from. Then Carrillo stopped in front of Flores's driveway. Carrillo was the aggressor. When Flores walked toward the truck, he was unarmed and had both hands in the air. Carrillo did not tell Gonzalez to drive away. Instead, Carrillo shot an unarmed man who had his hands in the air. Then Carrillo yelled out his gang name and fled.

There is no substantial evidence to support any self-defense instruction, whether perfect or imperfect.

### III

Carrillo contends that because the trial court sentenced him to life without the possibility of parole, it erred when it ordered him to register as a gang member.

But section 186.30 requires "any person" to register where a gang enhancement pursuant to section 186.22 is found to be true. There is no exception for persons sentenced to life without the possibility of parole.

The People concede, however, that because Carrillo was sentenced to life without the possibility of parole, the trial court erred in imposing a parole revocation fine. (§ 1202.45; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181-1186.)

The parole revocation fine is stricken. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P.J.

We concur:

YEGAN, J.

PERREN, J.

9

James P. Cloninger, Judge

Superior Court County of Ventura

_____


Robert  L. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Douglas L. Wilson, Deputy Attorney General, for Plaintiff and Respondent.