[Crim. No. 11521. Second Dist., Div. Four. Sept. 1, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. OTIS DARNELL HAYNES, Defendant and Appellant.

Walter L. Gordon, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Marjory E. Winston, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J. — Defendant Otis Darnell Haynes and Patricia Sue Johnston were accused in four counts of a violation of section 182 of the Penal Code (conspiracy to commit forgery), and with violations of section 470 of the Penal Code (forgery). Defendant's motion to set aside the information under Penal Code section 995 was denied and the defendant pled not guilty to all counts. The cause came to trial on June 1, 1965, and a jury was sworn. On June 3, 1965, both defendant Haynes and codefendant Johnston moved that the statements of codefendant Johnston not be admitted because they were not made voluntarily; the court found they were freely made and the motion was denied. Defendant's motion to sever under section 954 of the Penal Code was also denied.

The statement was admitted, accompanied by an appropriate instruction that it was admissible only against Miss Johnston and not against Haynes. Other evidence, tending to show Miss Johnston's guilt and, to some extent, implicating Haynes, was introduced. On June 7, 1965, the prosecution case being otherwise complete, the People dismissed as to Johnston, under section 1099 of the Penal Code, and she was called as a witness for the prosecution and testified in a manner which definitely implicated Haynes.

Defendant Haynes' motion for a mistrial was denied; he was found guilty of conspiracy and guilty on all four counts of forgery; his motion for a new trial was denied; he was sentenced for the term prescribed by law. Timely notice of appeal was filed and a stay of execution and bail pending appeal were granted.

There was ample evidence, independent of her own statements and testimony hereinafter discussed, to prove that Miss Johnston had passed, and had attempted to pass, sundry forged checks and money orders. If Miss Johnston's statement to the police and her testimony on the stand, given after the case against her had been dismissed, were properly introduced, there clearly was enough evidence to sustain defendant's

conviction on all counts. On the other hand, if it was error to use her statement, even with the precautionary instruction, or if, for any reason, Miss Johnston's testimony on the stand was improperly admitted, the state of the record is such that any error in these respects would have to be held prejudicial.

Acting on information received, Officer Zanone went to an apartment occupied by Miss Johnston and her ''common law'' husband,[1] for the purpose of arresting her. The ''common law'' husband, named Norris Carrier, and a woman named Jeanette Davis were also present. A bag of marijuana was observed on the floor next to the bed and near to Miss Johnston's head. The officer arrested all three persons, Carrier and Davis on a narcotics charge. It is not contended that the entry into the apartment or the arrest were unlawful. Due warning of constitutional rights to remain silent and to consult with counsel was given. Under circumstances hereinafter discussed, Miss Johnston made a statement which implicated defendant as her partner in the forgery operations. As indicated above, after her motion (made jointly with defendant's) to exclude this statement was denied and it was admitted, the prosecution dismissed its case against her and she testified for the People. Her testimony was substantially the same as her statement to the police.

## I

Defendant contends: (1) that Miss Johnston's statement to the police was involuntarily secured because it was induced by an offer of reward—namely, a promise to release the ''common law'' husband and Miss Davis; (2) that Haynes has standing to raise that objection; (3) that the testimony given by Miss Johnston on the stand was a ''fruit'' of the illegally obtained statement and was, therefore, also inadmissible against Haynes.

We need not decide the interesting questions raised by the second and third steps in this contention, since we conclude that the first, and foundational, proposition is missing, in that, on this record and in this court, we cannot

---

[1] We use this term, as it was used at the trial, in its popular and not in its technical legal sense. Carrier was not Miss Johnston's lawful husband either by ceremonial marriage or by virtue of a true common law marriage performed in a jurisdiction accepting that form of marriage contract. The meaning of the term as here used implies a relationship, meretricious in nature, but regarded by its parties as having elements of monogamy and permanence substantially similar to the elements of a lawful marriage.

say that the statement made by Miss Johnston to the police was illegally obtained or inadmissible.

On *voir dire*, Miss Johnston said that she told the officer, "If I said anything and I told you what I knew, if I do know anything, would you release him?" and he said, "Yes." She testified that she "had an arrangement" with Officer Zanone.

The *voir dire* of Officer Zanone related the following: "Q. At the time that this tape was taken did you tell Miss Johnston here that Norris Carrier, you already decided that he wasn't involved and, therefore, you had released him? A. No. I assumed she knew he was. She was within earshot of what was going on. Q. But did you put that part on the tape where she, where part of the conversation that referred to if you would cut him loose that she would tell you about Otis Darnell Haynes? A. If we would cut—Would you rephrase that, please? Q. All right. Yes. The part, as I understand it, where Patricia Johnston said she would tell you what you wanted to know about Otis Haynes if you will cut Norris Carrier loose. A. No, it wasn't in that terminology. The terminology was 'They didn't have anything to do with this. I will tell you what you want to know. Cut them loose. That is my marijuana.' Q. What did you say when she said that to you? A. I don't recall what I said. Well, I believe I did say that, asked her if she was willing to put her statement on tape. Q. At that time did you tell her that Norris Carrier was already loose? A. I don't believe I did, no. Q. Was this part of the conversation, that part that referred to cutting Norris Carrier loose, 'The marijuana is mine,' so on, was that put on the tape? A. I don't believe any mention was made of the marijuana on the tape. There is some mention made on the tape of Norris being cut loose, I believe. I believe that is about the first thing that spontaneously comes out on the tape right off the bat. Q. Actually, Sergeant Zanone, at the time this Patricia Johnston was asking you or was telling you that she would make a statement if a certain something was done with Norris Carrier; isn't that true? A. No. Q. Isn't it true that you, that at that time you knew by observing her and by listening to what she said that she was prepared to make a statement and did in fact make a statement on the belief that Norris Carrier would be cut loose? A. I didn't know what her state of mind was. I was convinced in my own mind that Norris was not involved. Whether or not I conveyed that feeling or that impression to the defendant, I couldn't say. Q. Well, didn't you realize

that—Well, let me ask you this: As far as your state of mind is concerned, did you feel that you were, that you had made, you were making this kind of arrangement with Patricia Johnston, she was going to tell everything she knew in reference to this check operation, and you in turn were going to cut Carrier loose? A. That wasn't the impression I had or the arrangements that were to be made. I had nothing to cut him loose from. Q. Even the possession of marijuana? A. I felt, oh, possibly we could have taken the entire house on the possession of marijuana, but— Q. Did you ever make a statement to Miss Johnston, what you couldn't put on her you were going to put on Carrier? A. Never.''

It is not contested that a confession obtained by an offer of reward of favorable treatment for defendant or members of his immediate family is involuntary and not admissible. The Attorney General argues, however, that this doctrine is not here applicable since it does not apply where the official promise of leniency is directed only to friends and not to members of the confessor's immediate family. We do not decide whether or not a ''common law'' husband is within the group to which the rule above referred to extends, since we conclude that the confession was not inadmissible in any event.

As the quotations from the record above quoted indicate, there was a conflict in the testimony. If the police officer is believed, the decision to release Carrier and Davis had already been reached, on grounds independent of Miss Johnston's confession, and she was aware of that fact. If that were so, then the confession was not induced by any offer or promise, illegal or otherwise, and was admissible. ▆▆ But it is for the trial court, and not for us, to resolve conflicts in the evidence. The issue was before the trial court on defendant's objection and motion; that court accepted the version favorable to the People; we are bound by its determination.

## II

▆▆ Defendant next argues that, assuming the voluntariness of Miss Johnston's confession, he was entitled to more than the cautionary instruction given by the court—that he was entitled either to a separate trial, or to such editing of the confession as would delete therefrom any reference to him, citing *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].

As ultimately presented to us, this point involves two propositions. The first argument is that the statement, although

legally obtained insofar as the rules laid down in *People* v *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], are concerned, was not obtained in conformity with the additional requirements laid down in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]). But, in *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882], the Supreme Court held that the rules as to warning first announced in *Miranda* were not applicable to cases in which (as here) the trial antedated the pronouncement of that opinion. It follows that *Aranda* cannot be invoked on that theory.

The second argument is that, assuming that the statement was not only voluntary but also legally obtained, defendant Haynes was entitled to a separate trial or an editing under the rules of procedure first announced in *Aranda*. However, these special rules were not pronounced until five months after the trial in this case. The principles relied on in *Johnson* for rejecting retroactivity for *Miranda* apply equally to prevent *Aranda* from being applied in any case tried before its filing where the statement involved was lawfully obtained. As we recently said, in an opinion thus anticipating *Johnson* (*People* v. *Williams* (1965) 239 Cal.App.2d 42, 45-46 [48 Cal.Rptr. 421] : "It is to be noted that the court in *Aranda* does not hold that the change in the law applicable to section 1098 is to be considered as 'constitutionally compelled,' but states that the rules it sets up are 'judicially declared rules of practice to implement section 1098.' We interpret the *Aranda* decision as establishing 'new rules' to be applied henceforth (from the date *Aranda* was filed) to cases which have not yet reached that stage of the proceedings, but as not necessarily compelling a reversal of cases theretofore tried. Under the procedural rules applicable at the time of the trial in the instant case the trial court did not abuse its discretion in refusing to grant separate trials. [Citations.]"

### III

Defendant argues that the "District Attorney throws his official weight in favor of woman co-defendant to the prejudice and detriment of appellant." This argument results from the following statement made by the district attorney in the presence of the jury: "Your Honor, at this time the People will move the court to direct that the defendant, Patricia Johnston, be discharged on the charges in this information so that the People may call her as a witness for the People under the provisions of Section 1099 of the Penal Code."

The Court asked: "All charges against her?

"MR. BOON: Charges in this case.

"THE COURT: All five counts?

"MR. BOON: Yes, your Honor."

 Appellant claims that this treatment of the codefendant favored the value of her testimony and caused undue respect for the testimony. Appellant bases this argument on the case of *People* v. *Alverson* (1964) 60 Cal.2d 803 [36 Cal.Rptr. 479, 388 P.2d 711], where, as here, the prosecution's case against the testifying witness (Williamson) was strong, and comparatively the case was weak against the other defendants except for the testimony of Williamson. However, the objectionable conduct in the *Alverson* case is clearly distinguishable from the conduct objected to here. In *Alverson,* the prosecutor told the jury in his closing argument that he believed Williamson was telling the truth and that Williamson was not guilty.

In the case at bench the prosecutor certainly neither expressed nor indicated any personal belief that Miss Johnston was innocent; the very testimony he was about to elicit from her was self-incriminatory. Nor did he, as was done in *Alverson,* express any personal opinion as to Miss Johnston's credibility, beyond that always implicit in the act of calling any witness. The criticism of the prosecutor in *Alverson* was based on the fact that he had not utilized the very procedure followed here—namely, to dismiss against the codefendant under section 1099. We can see no possible prejudice; if anything, the tactic might well have operated (although it did not do so in fact) in favor of Haynes, by inducing the jury to look with disfavor on convicting an accessory and releasing the principal.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 26, 1966. Peters, J., was of the opinion that the petition should be granted.