Filed 11/13/13  P. v. Fullmore CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID EDWARD FULLMORE et al.,<br><br>        Defendants and Appellants. | C068389<br><br>(Super. Ct. No. 09F06445) |

Following a joint trial, a jury convicted defendant David Edward Fullmore and defendant Keith Xavier Nesbit of two counts of second degree robbery.  (Pen. Code, § 211--counts two and three; unless otherwise stated section references that follow are to the Penal Code).  The jury also found Fullmore guilty of a third count of second degree robbery (§ 211--count one) as well as a false imprisonment charge.  (§ 236--count four.)  As to counts two and three, the jury found true allegations that Fullmore personally used a firearm (§ 12022.53, subd. (b)), and, as to Nesbit, that a principal in the commission of the robberies was armed with a firearm.  (§ 12022, subd. (a)(1).)  For count four, the jury

1

found true an allegation that Fullmore personally used a firearm. (§ 12022.5, subd. (a)(1).)

In subsequent proceedings, the trial court found Fullmore had two prior convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12) After striking one of Fullmore's prior strikes, the trial court sentenced Fullmore as a second striker to 37 years in state prison and awarded him 631 days of custody credit and 94 days of conduct credit.

The court denied Nesbit probation and sentenced him to 5 years 4 months in state prison, imposing consecutive sentences for counts two and three. Nesbit was awarded 633 days custody credit and 94 days conduct credit.

Both defendants appeal. Defendant Fullmore contends (1) his conviction for the count two robbery must be reversed because the trial court erred by refusing to grant a mistrial motion after a police officer inadvertently testified Nesbit confessed to being with Fullmore at the location of the robbery, and (2) the court erred in failing to stay his sentence on the count four false imprisonment charge under section 654. Fullmore does not challenge his convictions on counts one, three and four.

Defendant Nesbit contends (1) his count two robbery conviction must be reversed for reasons similar to Fullmore, (2) insufficient evidence supports his count three robbery conviction on an aiding and abetting theory, (3) the trial court erred in denying him probation, and (4) his trial counsel was ineffective for failing to object when the trial court did not state on the record the reasons for imposing consecutive sentences.

We reject defendants' contentions and affirm.

FACTS AND PROCEEDINGS

Defendants and Antonio Howard spent the night of August 25, 2009, at the apartment of defendant Fullmore's sister, Nycquia Fullmore. At the time, Nycquia and defendant Nesbit were dating. Howard is the half brother of three of Nycquia's children.

2

Although not actually related, Fullmore and Howard were close and referred to each other as "cousins."

The apartment complex was located next to a liquor store and a Payday Loans. A Chevron gas station was located across the street. A Round Table pizza was also located nearby.

Around 11:00 a.m. the next morning, on August 26, Nycquia and Nesbit showered together. After showering, Nycquia asked Nesbit to go to the liquor store to get her some candy. Nesbit left alone but returned a few minutes later because he needed more money. Nesbit and Fullmore then left the apartment together. A short time later, Howard left the apartment to catch up to Nesbit and Fullmore.

When he left the apartment, Nesbit was wearing a brown and white checkered shirt and reddish jeans. Fullmore was wearing a white shirt and jeans.

All three men returned to the apartment about 10 minutes later; although Nycquia testified her time estimates the day of the robberies were not absolutely precise. Upon their return, defendants and Howard watched television. Later, Nycquia walked outside to the mailboxes to collect the mail, which was usually delivered to the apartment complex between 11:00 or 11:15 a.m. While outside Nycquia saw several police officers questioning people in the apartment complex. Nycquia called Nesbit, who was still inside the apartment, and told him about the police. Nesbit seemed agitated over the phone. A few minutes later, the police knocked on Nycquia's apartment door to investigate two robberies that occurred at the Payday Loans and Chevron earlier that day.

A.    *Count Two--Payday Loans Robbery*

At approximately 11:20 a.m., M.W. was walking to work at the Round Table near the apartment complex. Before going to work, M.W. stopped at the Payday Loans to cash a money order.

As M.W. approached the Payday Loans, he saw two men standing beside a garbage can. The taller man called out, asking M.W. to come over to where they were

3

standing. M.W. declined. The taller man followed him into the Payday Loans and stood looking over his shoulder before leaving. After cashing the money order, M.W. walked out of the building. Once outside, the taller man grabbed his arm while the shorter man pulled a silver gun with a black handle from the right front pocket of his jeans, shoved it in M.W.'s ribs, and said, "If you move, I'm going to shoot you." The shorter man grabbed between $60 and $80 from M.W.'s pocket. The shorter man then walked away and the taller man followed a few seconds later.

M.W. called police to report the incident. He described the man with the gun as a black man approximately five-foot-six or five-foot-seven, weighing about 150 to 160 pounds. He had short hair, hazel eyes, and was wearing a red shirt and a white shirt and blue jeans. M.W. described the taller assailant as a black man approximately five-foot-ten to six feet tall and weighing between 140 to 150 pounds. The taller man had a mustache, wore a brown shirt and had dread locks in his hair, which M.W. later clarified meant braids. M.W. described the gun as a silver and black .32-caliber revolver.

While interviewing M.W. around 11:40 a.m. that morning, the officer heard a dispatch report about a second robbery that had just occurred at the Chevron. The suspects were two black males generally fitting M.W.'s description of the two men who accosted him at the Payday Loans moments earlier.

B.      *Count Three--Chevron Robbery*

Because Fullmore does not challenge his conviction for the count three robbery of D.R. at the Chevron, and Nesbit challenges his conviction only to the extent that insufficient evidence shows he aided and abetted Fullmore in the robbery, the facts regarding count three are recounted in the light most favorable to the judgment. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

At approximately 11:30 a.m. that day, D.R. was at the Chevron gas station across the street from the Payday Loans purchasing some items in the convenience store. D.R. walked outside to her car where Fullmore approached her. While D.R. sat in her car,

4

Fullmore stood between the door and the car to prevent D.R. from closing the door. Fullmore demanded D.R.'s money and pulled up his shirt to reveal a silver gun in the right front pocket of his jeans.

After rifling through her purse and locating only loose change, Fullmore ordered D.R. into the convenience store to withdraw money from an ATM machine. Nesbit followed them inside. Once inside, Fullmore stood beside D.R. while she withdrew $200 and Nesbit talked to the cashier. Fullmore took the money directly from the machine and left. Nesbit immediately followed Fullmore out the door. Before leaving, either Fullmore or Nesbit told D.R. not to call police.

When officers arrived a short time later, D.R. said she could not describe the men very well because she did not look too closely at their faces since she was scared. She did say, however, that the man with the gun was black, 18 to 20 years old, five-foot-six to five-foot-ten with curly hair and that he was wearing a white shirt and dark jeans. She said the gun was silver and that the man had light brown eyes.

*C.* *Surveillance Video*

Surveillance video taken inside the Chevron store shows D.R. in the store purchasing items at 11:38 a.m. The video also shows Fullmore, Nesbit, and Howard in the store moments earlier. Both Fullmore and Howard are wearing white shirts; Nesbit is wearing a brown and white checkered shirt.

Five minutes later, the surveillance video shows D.R. back in the store at the ATM machine with Fullmore. The surveillance footage also shows Nesbit talking to the clerk while D.R. and Fullmore were at the ATM machine. Nesbit exits the Chevron store almost immediately after Fullmore takes the money from the ATM machine and leaves. The surveillance video does not show Howard in the store at that time.

There was no surveillance video showing the events at the Payday Loans.

D.      *Police Investigation*

Due to its proximity to both robberies, police searched the apartment complex where Nycquia lived and where defendants and Howard had stayed the previous night. The apartment manager directed officers to Nycquia's apartment.

The police knocked and announced their presence at Nycquia's apartment but no one answered. Police stationed at the rear of the apartment saw what appeared to be a black man's hand frantically trying to open a back window through the blinds.

Nycquia finally walked over from the mailboxes where she had been observing the police activity and gave officers a key to the apartment. She told officers that Fullmore, Nesbit, and Howard were inside, but only Nesbit and Howard came out once the door was opened. Fullmore was gone.

When Howard left the apartment, he had long hair pulled back in a pony tail. Howard was approximately six feet tall and weighed over 200 pounds. Nesbit had a mustache, curly hair, and was wearing a blue basketball jersey. Nesbit stood six feet tall and weighed about 195 pounds.

Police conducted separate field show ups for both victims with Nesbit and Howard. After commenting the men looked like they had changed their hair or clothes, M.W. identified Nesbit as the taller assailant and Howard as the gunman. D.R. did not identify either man.

Nesbit was arrested and gave a statement to police placing most of the blame on Fullmore for the robberies. Police subsequently determined Howard was not involved and he was released from custody.

While searching the apartment, the police found a brown and white checkered shirt. The police also found a silver and black .32 revolver loaded with four live rounds, stuffed in a sock, and hidden in the bedroom closet under some towels. Although she later denied it at trial, the day of the robberies Nycquia told officers the gun was Fullmore's and that he had put it in a sock on a shelf in the closet.

6

After being threatened with jail, Nycquia called Fullmore and told him to come back to the apartment if he did nothing wrong.  Fullmore did not return.  He was arrested two days later.  At the time of his arrest, Fullmore was 5 feet 6 inches tall and weighed 150 pounds.

The next week a detective met with M.W. and showed him surveillance video still frames from inside the Chevron store.  M.W. recognized Nesbit in the still frames as the taller man at the Payday Loans because of his brown and white checkered shirt, which looked identical to the shirt police found in Nycquia's apartment.  Although M.W. was sure about his previous identification of Nesbit, he was unsure of his prior identification of Howard as the shorter gunman because the gunman had short hair and Howard had long hair pulled in a pony tail at the field show up.  After the detective showed M.W. a photographic lineup containing Fullmore's picture, M.W. identified Fullmore as the man with the gun.  The detective did not show M.W. a photographic lineup containing Nesbit's picture.

The detective also showed M.W. pictures of the gun recovered from Nycquia's apartment.  M.W. said it looked like the same gun used in the robbery.

The next day, the detective met with D.R.  She, too, identified Nesbit from still frames taken from the surveillance video of the Chevron robbery.  Like with M.W., the detective showed D.R. the same photographic lineup of Fullmore.  D.R. identified Fullmore and said she thought he was the man with the gun at the Chevron station.  The detective also showed D.R. a photographic lineup containing a picture of Nesbit.  D.R. identified Nesbit as the man with Fullmore during the robbery, although she could not say whether Nesbit did or said anything to her.

E.    Trial

Defendants were tried jointly in 2011, nearly two years after their arrest.  Based on Nesbit's statements to police implicating Fullmore in the robberies, Fullmore's counsel

moved for separate juries to avoid any Sixth Amendment confrontation issues. After the parties agreed Nesbit's statements would not be introduced, the court denied the motion.

During trial M.W. testified it had been a long time since the robbery and he was not sure if the defendants were the perpetrators. Defendants' appearance, especially their hairstyles, had changed from when they were arrested. Although he originally testified Fullmore looked like the shorter man with the gun, upon closer inspection M.W. said he could not tell if Fullmore was the gunman. M.W. also testified that he did not see the taller assailant in court.

D.R. testified that Fullmore was the man with the gun at the Chevron station. She said two other men were with Fullmore outside, one of whom she identified as Nesbit. She also testified that Nesbit walked back into the Chevron with her and Fullmore, and then walked outside with Fullmore after he took the money from the ATM machine.

Both M.W. and D.R. testified that the gun recovered from Nycquia's apartment looked like the gun used in the robberies. The parties stipulated that no name was registered to the gun with the Department of Justice, no latent fingerprints were found on the gun, and that defendants were excluded from being contributors to a mixture of DNA found on the gun from three different people. The crime lab considered the inconclusive DNA mixture not suitable for either inclusion or exclusion of specific contributors.

The jury also heard several phone conversations between Fullmore and Nycquia while Fullmore was in jail awaiting trial. During one call, Fullmore said if there was video he was "going to be fucked." In another, Fullmore apologized to Nycquia for leaving the apartment without first grabbing that "motherfucker," which Nycquia understood to mean the gun and marijuana. In a third call, Fullmore and Nycquia joked about jumping out of the apartment's back window. Nycquia admitted she was aware her brother climbed out the back window of the apartment the day of the robberies. In another call to an unknown acquaintance made two days after being arrested, Fullmore

8

said, "I don't know, I think somebody told on a nigga, like my cousin, because it was three of us.  You know what I'm saying?  And this motherfucker not even in jail."

The jury convicted defendants on all counts and found all enhancement allegations true.  Defendants timely appealed.

DISCUSSION

I

*Count Two Robbery (Fullmore and Nesbit)*

Both Fullmore and Nesbit challenge their convictions for the count two robbery of M.W. at the Payday Loans, claiming the trial court abused its discretion in denying their mistrial motion after an investigating detective explained, in response to a question by Nesbit's counsel, that he did not show M.W. a photographic lineup of Nesbit because M.W. had previously identified Nesbit in a field show up and Nesbit had confessed to being at the Payday Loans with Fullmore.  In denying the motion for mistrial, the court acknowledged the parties' previous understanding that Nesbit's statements to police would not be introduced in evidence, but ultimately ruled the detective's "errant statement at the conclusion near the end of the trial" did not render the trial fundamentally unfair.  The court noted that evidence of defendants' presence together the day of the robberies near the location of the Payday Loans had already been admitted, and that the jury could decide whether defendants were together or not at that location.

On appeal, Fullmore contends the investigating officer's volunteered testimony about Nesbit's statement violated his Sixth Amendment right to confrontation since Nesbit never testified and the testimony was prejudicial beyond a reasonable doubt because M.W. had originally identified Howard as the gunman and could not definitively identify Fullmore at trial.  (See *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] [a nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible]; *People v. Aranda* (1965) 63 Cal.2d 518.)  Nesbit likewise

9

contends the detective's testimony was incurably prejudicial to him because it eviscerated Nesbit's defense that he was not the taller assailant at the Payday Loans. This is especially so, Nesbit argues, because M.W. did not identify Nesbit during trial. According to defendants, the trial court's refusal to grant their mistrial motion based on the inadvertent introduction of Nesbit's out-of-court statement constituted a prejudicial abuse of discretion.

Trial courts are granted wide latitude in ruling on mistrial motions. " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) We review the denial of a motion for a mistrial under the abuse of discretion standard. (*Id.* at p. 986.) It is not an abuse of discretion when a trial court denies a motion for mistrial after being satisfied that no injustice has resulted and the party's chances of receiving a fair trial have not been irreparably damaged. (*People v. Eckstrom* (1986) 187 Cal.App.3d 323, 330.)

We find no reason to disturb the trial court's determination that the detective's testimony did not incurably prejudice defendants. The detective did not testify that Nesbit confessed to actually robbing M.W. with Fullmore. Instead, the testimony revealed only that Nesbit confessed to being at the Payday Loans with Fullmore.

But evidence that Fullmore and Nesbit were near the Payday Loans that day was uncontroverted. Fullmore and Nesbit stayed the previous night at Nycquia's apartment, which was located next to the Payday Loans. The day of the robbery Fullmore and Nesbit left Nycquia's apartment to go to the liquor store to buy her candy sometime after 11:00 a.m. The liquor store was located next door to the Payday Loans. M.W. was robbed around 11:20 a.m. The surveillance video from the Chevron station--located directly across the street from the Payday Loans--also shows Fullmore and Nesbit

10

together at approximately 11:37 a.m. In closing arguments, Fullmore's counsel even conceded Fullmore was in the area that day.

Based on the state of the evidence, the trial court was amply justified in finding the detective's statement that Nesbit confessed to being with Fullmore at the Payday Loans was not incurably prejudicial. The trial court acted within its discretion in denying the motion for a mistrial.

Even if an error occurred, it was harmless beyond a reasonable doubt. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128-1130; see *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].) Where a trial court erroneously admits a nontestifying defendant's extrajudicial statement implicating a codefendant, the error is not per se prejudicial. (*Anderson,* at p. 1128.) An appellate court must determine whether the statement was sufficiently prejudicial to require reversal based on its own reading of the record and the probable impact such evidence had on the minds of the average jury. (*Ibid.*) When the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless. (*Id.* at p. 1129.)

Such is the case here. Given the overwhelming evidence against defendants, we are satisfied the jury would have convicted them of robbing M.W. even in the absence of the detective's cumulative testimony regarding Nesbit's out-of-court statement that he and Fullmore were at the Payday Loans.

The evidence at trial revealed the following: Based on M.W.'s eyewitness account of the robbery, the shorter man with the gun was black, five-foot-six or five-foot-seven, weighed 150 to 160 pounds and had short hair and hazel eyes. Fullmore matched that description. While it is true M.W. originally identified Howard as the gunman, he later expressed doubt about that identification because Howard had a long ponytail at the field show up and the gunman had short hair. At six feet tall and over 200 hundred pounds,

Howard was also physically much larger than the gunman. When shown a photographic lineup of Fullmore, M.W. immediately identified him as the gunman.

Based on his observation of the crime, M.W. also described the taller man who grabbed him as black, approximately five-foot-ten to six feet tall with a mustache, short dreads or braids, and wearing a brown shirt. When he was arrested, Nesbit was six feet tall with curly hair and a mustache. The Chevron surveillance video shows Nesbit wearing a brown and white checkered shirt that morning, which police later found in Nycquia's apartment. M.W. also identified Nesbit at the field show up as the taller assailant who grabbed him outside the Payday Loans, and identified him again after seeing Nesbit in the Chevron video wearing the brown and white shirt.

That M.W. did not definitively identify Fullmore or Nesbit during trial is not surprising. Trial occurred nearly two years after M.W. was robbed, and the defendants had changed their appearance, especially their hairstyles. It is more revealing that M.W. identified Nesbit in the field show up the day of the robbery, confirmed his previous identification of Nesbit a week later after seeing video surveillance stills from the Chevron, and immediately picked Fullmore out of a photographic lineup after he was arrested.

M.W. described the gun the man pulled from his right front pocket of his jeans as a silver .32 revolver with a black handle. Similarly, Fullmore lifted his shirt to reveal a silver gun in the right front pocket of his jeans when robbing D.R. at the Chevron. A silver .32 revolver with a black handle was found hidden in a sock in Nycquia's apartment--the same apartment where Fullmore and Nesbit had been staying. And, Nycquia told officers the gun was Fullmore's. Both D.R. and M.W. also testified the gun found in Nycquia's apartment resembled the gun used in each of their respective robberies. Based on this evidence the jury reasonably could have concluded Fullmore used the gun found in Nycquia's apartment to rob M.W. and D.R.

12

The fact that Fullmore's fingerprints or DNA were not found on the gun is not particularly meaningful. As the parties stipulated, it is only by chance that someone leaves a latent fingerprint, and whether a person leaves DNA on an object they handle depends on many factors. Also, the DNA mixture was not appropriate for including or excluding possible contributors.

Defendants' conduct when police searched the apartment complex also shows a consciousness of wrongdoing which the jury could have inferred against defendants. Nesbit seemed agitated after Nycquia called and told him police were outside. In an apparent attempt to alter his appearance, Nesbit changed his brown and white checkered shirt to a blue basketball jersey. When police arrived at Nycquia's apartment a few minutes after Nycquia called Nesbit, Fullmore was gone. He had climbed out the back window and fled. Fullmore did not return when Nycquia called and told him to come back if he did nothing wrong.

Deliberately altering one's appearance gives rise to a consciousness of guilt inference. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1001.) So, too, does fleeing from the scene or attempting to hide or suppress evidence and the jury was so instructed. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [consciousness of guilt may be inferred where defendant departs scene to avoid being observed or arrested]; *People v. Watkins* (2012) 55 Cal.4th 999, 1027 [hiding a weapon evidences a consciousness of guilt].)

Fullmore's recorded jail phone calls also constitute further evidence supporting defendants' convictions. Fullmore told Nycquia he should have grabbed the gun before he left, and joked about climbing out the back window of the apartment when the police arrived. Fullmore also said his "cousin"--Howard--likely snitched because three of them were involved and only Fullmore and Nesbit were in jail, implying he and Nesbit had in fact committed the robberies. And most telling, Fullmore admitted that if there was surveillance video that he was "going to be fucked."

13

Relying on *People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete*), defendants argue that improperly admitted testimony alluding to a defendant's purported confession requires a mistrial. That case is distinguishable, however. There a police officer deliberately referred to the defendant's suppressed statement implying the defendant had already confessed to the crime. (*Id.* at pp. 830-831.) The court struck the testimony and admonished the jury to disregard it entirely, but denied defendant's motion for mistrial. (*Id.* at pp. 831-832.) The appellate court reversed holding the curative instruction could not undo the damage inflicted by referring to the suppressed statement. (*Id.* at p. 834.) In reaching its decision, the appellate court emphasized the case against the defendant was "not overwhelming" and that the detective had deliberately disobeyed the court's order precisely to prejudice the jury against the defendant. (*Id.* at p. 834, see also *id*. at p. 836.)

Here, by contrast, the detective's testimony referred to Nesbit admitting he was near the Payday Loans with Fullmore, and not that he confessed to robbing M.W. The direct and circumstantial evidence of defendants' guilt, moreover, was substantial. Unlike in *Navarrete*, an admittedly "less than airtight case" (*Navarrete, supra,* 181 Cal.App.4th at p. 834), the overwhelming weight of the evidence shows that Fullmore and Nesbit robbed M.W. at the Payday Loans. And nothing in the record suggests the detective purposefully testified to Nesbit's statement to prejudice the jury. As the trial court noted, the officer was merely responding to an open ended question from Nesbit's counsel as to why he did not show M.W. a photographic lineup of Nesbit.

Even without the detective's testimony that Nesbit confessed to being with Fullmore at the Payday Loans, it is clear beyond a reasonable doubt the jury would have convicted defendants of the count two robbery. Defendants, therefore, suffered no prejudice from a single, inadvertent reference to Nesbit's statement at the conclusion of trial. The statement was merely cumulative of other properly admitted evidence.

14

## II

### *Section 654 (Fullmore)*

The jury convicted Fullmore of falsely imprisoning D.R. in count four. Fullmore contends the trial court erred in refusing to stay his count four sentence under section 654. According to Fullmore, he harbored the single objective of taking D.R.'s money; forcing D.R. back into the Chevron station to withdraw money from the ATM machine after he obtained only loose change at her car was merely part of an indivisible course of conduct to deprive D.R. of her personal property as part of the robbery charged in count three. Although the probation report also recommended staying the sentence under section 654, the trial court disagreed, concluding "there was an intent to rob and then a separate intent was formed to actually force her from the vehicle into the Mini Mart." We conclude substantial evidence supports the trial court's finding and reject Fullmore's contention.

Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute does not prohibit multiple convictions for the same conduct, only multiple punishments. (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.) "In such a case, the proper procedure is to stay execution of sentence on one of the offenses." (*Ibid.*)

In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent. (*People v. Porter* (1987) 194 Cal.App.3d 34, 38 (*Porter*).) "If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*Ibid.*) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a

15

question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*Ibid.*)

The record in this case supports the trial court's finding that the robbery of D.R. and her false imprisonment involved multiple objectives even though they may have shared common acts or were otherwise parts of an indivisible course of conduct. A reasonable inference from the record is that Fullmore initially planned only to rob D.R. of the contents of her purse while seated in her car, but thereafter came up with a new idea: falsely imprisoning D.R. by forcing her from her car and back inside the Chevron convenience store to compel her to withdraw money from the ATM machine. Similar conduct has been found separately punishable under section 654. (See *Porter, supra,* 194 Cal.App.3d at p. 38 [defendant properly convicted and sentenced for robbery of victim's wallet and of kidnapping for the purpose of a robbery involving the compelled withdrawal of funds from an automated teller machine].)

The decision in *Porter* is instructive. There, the victim was getting into his car when the appellant jumped into the vehicle while brandishing a knife. (*Porter, supra*, 194 Cal.App.3d at p. 36.) The appellant's accomplice got in and rifled though the victim's wallet. (*Ibid.*) After finding less than $10, the appellant ordered the victim to drive to a bank to withdraw additional money from an ATM machine, which was unsuccessful. (*Ibid.*) The appellant was ultimately convicted of robbing the victim and kidnapping for the purpose of robbery. (*Ibid.*) The court upheld his punishments for both crimes, rejecting the appellant's argument that section 654 precluded double punishment since appellant had a single objective of robbing the victim. (*Id.* at pp. 37-38.) "What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant achieve a greater reward." (*Id.* at pp. 38-39.)

16

This is precisely what occurred here. No longer satisfied with simply taking the coins he found in her purse, Fullmore decided to forcibly compel D.R. to exit her car and walk back into the Chevron convenience store where, only with her assistance in withdrawing money from the ATM machine, did Fullmore achieve a greater reward. Falsely imprisoning D.R. to compel her to do so was qualitatively different than merely taking the money from her purse while she was seated in her car.

That Fullmore did not force D.R. to drive several city blocks to a bank like the victim in *Porter* does not render Fullmore's false imprisonment conduct incidental to the robbery as he argues. Since Fullmore had previously been inside the store, a reasonable inference exists that he was aware of the ATM located inside and thus there was no need to force D.R. to drive to a bank. Yet like in *Porter*, the secondary plan of forcing her to withdraw money from the ATM, hatched after obtaining an initially disappointing haul, remains the same.

The trial court did not violate section 654 by imposing consecutive sentences on Fullmore for the robbery and false imprisonment of D.R.

### III

### *Count Three Aiding and Abetting Robbery (Nesbit)*

Both Fullmore and Nesbit were convicted of the second degree robbery of D.R. at the Chevron station. Fullmore does not challenge that conviction. Nesbit, on the other hand, contends the record lacks sufficient evidentiary support to show he aided and abetted Fullmore in the robbery even though he admits he was there. In other words, Nesbit claims that his mere presence at the Chevron station is insufficient to show he knew Fullmore was robbing D.R. or that he encouraged or facilitated him in doing so. We disagree with Nesbit's view of the evidence and conclude substantial evidence supports Nesbit's count three robbery conviction on an aiding and abetting theory.

When determining whether there is substantial evidence to support a conviction, we view the record in a light most favorable to the People, resolving all conflicts in the

17

evidence and drawing all reasonable inferences in support of the conviction. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408 (*Campbell*).) "We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant guilty on the theory presented." (*Ibid.*)

" 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages, or instigates the commission of the crime.' " (*Campbell, supra,* 25 Cal.App.4th at p. 409.) Although neither presence at the scene of a crime nor knowledge of, but failure to prevent a crime, is sufficient to establish aiding and abetting its commission, a court may consider presence at the scene, companionship, and conduct before and after the offense when determining whether a defendant is guilty of aiding and abetting the perpetrator. (*Ibid.*)

In this case, the record contains substantial evidence supporting Nesbit's conviction. Shortly after leaving Nycquia's apartment, Nesbit and Fullmore robbed M.W. together at the Payday Loans. Nesbit followed M.W. into the check cashing store to see the amount of his money order, and grabbed M.W. when he left the Payday Loans so Fullmore could shove the gun in his ribs and take his money. As an active participant in robbing M.W., Nesbit was fully aware of Fullmore's criminal intent that day, and the jury could have reasonably inferred that Nesbit formed a similar intent to encourage or help Fullmore prior to robbing D.R. at the Chevron only moments later. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)

D.R. also testified that Nesbit and Fullmore were together and that Nesbit accompanied them into the Chevron store. Surveillance video shows Nesbit talking to the store clerk at the counter while Fullmore took D.R. to the ATM machine. The jury could reasonably infer that Nesbit was trying to distract the clerk or obscure her view of

18

what was taking place at the ATM machine. (*Campbell, supra,* 25 Cal.App.4th at p. 409 [blocking one's view, diverting suspicion, and watching for others who might approach are textbook examples of aiding and abetting behavior].)

As soon as Fullmore finished at the ATM machine and left, Nesbit followed, suggesting they were acting in concert. While leaving, either Fullmore or Nesbit told D.R. not to call the police. Even assuming it was Fullmore who made the statement, there is no evidence Nesbit seemed surprised by the comment, intimating he was fully aware of and a participant in the robbery. Thus, the evidence, when viewed in the light most favorable to the judgment, reasonably indicates that Nesbit played an affirmative supportive role in robbing D.R. and was not simply an unwitting bystander to the crime. His conviction of robbery on an aiding and abetting theory was proper.

IV

*Denial of Probation (Nesbit)*

Nesbit contends the matter must be remanded for resentencing because the trial court incorrectly assumed Nesbit was ineligible for probation. Because the record belies Nesbit's argument, we reject it.

As Nesbit correctly points out, the trial court originally stated he did not qualify for probation under subdivision (k) of section 1203, which bars probation for certain felonies when committed while on prior felony probation. But as Nesbit concedes, both the prosecutor and Nesbit's counsel alerted the court to its misunderstanding regarding Nesbit's prior felony probation status during the sentencing hearing. Thus, the court was plainly aware that Nesbit was eligible for probation at the time of sentencing. Indeed, after the prosecutor brought the error to the court's attention, the court stated, "Well, then, that changes things." That the court ultimately did not grant probation does not mean it erred.

Because the prosecutor corrected the trial court's misunderstanding of Nesbit's legal status at the sentencing hearing, the court was no longer laboring under any

19

erroneous assumption as to Nesbit's eligibility for probation when sentencing him for the convictions which we have since upheld on appeal. These facts distinguish the present case from those Nesbit cites in support of resentencing where, for various reasons, the trial court's incorrect assumption was not corrected during the sentencing hearing or a defendant's conviction was later overturned on appeal. (See *People v. Ruiz* (1975) 14 Cal.3d 163,165-166, 168 [remand for resentencing warranted where the defendant was sentenced for possessing heroin for sale but the appellate court modified the conviction to one of simple possession]; *People v. Alvarez* (2002) 95 Cal.App.4th 403, 406, 409 [trial court not made aware during sentencing hearing that statutory provision precluding probation for personal use of a deadly weapon during an assault did not apply to defendant because he did not personally use a weapon]; *People v. Manriquez* (1991) 235 Cal.App.3d 1614 [resentencing warranted where it was not brought to trial court's attention during sentencing hearing that accomplice's use of gun in murder did not make defendant ineligible for probation]; *People v. Sherrick* (1993) 19 Cal.App.4th 657, 658-659 [prosecutor failed to perform her duty to inform the trial court that felony complaint alleged inapposite probation ineligibility section where defendant pleaded guilty to lewd conduct on a person 10 years younger than defendant but did not admit an allegation that he orally copulated a child under the age of 11 as the victim was 14 years old].)

The record shows the trial court correctly understood Nesbit's legal status at the sentencing hearing and did not harbor an erroneous impression that he was ineligible for probation after the prosecutor and defense counsel pointed out that Nesbit's prior convictions for which he was on probation were misdemeanors rather than felonies. The court, therefore, did not err in denying probation.

V

*Ineffective Assistance of Counsel (Nesbit)*

Nesbit finally contends his trial counsel was ineffective for failing to object when the trial court sentenced him consecutively on counts two and three without articulating

20

its reasons for the consecutive sentences.  Nesbit has failed to carry his burden of establishing prejudice and on that basis we reject his claim.

Even assuming for the sake of argument that counsel's performance was ineffective, Nesbit does not, and cannot, establish a reasonable probability that the result would have been different had counsel requested the court state on the record its reasons for imposing consecutive sentences.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  Because Nesbit has failed to establish the requisite prejudice necessary for a remand for resentencing, we need not consider whether the performance of Nesbit's counsel fell below that of a reasonably competent attorney.  (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674] ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

Rule 4.425 of the California Rules of Court (hereafter rule 4.425) lists the criteria for sentencing consecutively rather than concurrently.  Among other things, these factors include "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."  (Rule 4.425(a).)  The record shows the trial court properly considered these factors.

The probation report, which the trial court reviewed before imposing sentence, recommended consecutive sentences because "the crimes were committed at different times and separate places and may be sentenced consecutively" under rule 4.425(a)(3).  The court also considered Nesbit's statement in mitigation, which requested a concurrent sentence on count three because "little time lapsed between the crimes and none of the defendant's [*sic*] had reached a place of safety."  Based on this evidence, then, the court was aware of and considered the appropriate factors when determining whether to

21

sentence Nesbit consecutively. That the probation report did not recite the language of rule 4.425(a)(3) verbatim is of no moment given Nesbit's extensive criminal history, which the trial court and the prosecutor noted on the record. These comments reveal the court considered whether Nesbit's convictions were a single period of aberrant behavior versus the latest episode in a long line of criminal conduct. The court impliedly found the latter, and the record supports this implied finding.

The evidence in the record, moreover, shows Nesbit robbed two separate victims at two different businesses. Although the businesses were in close proximity, that fact alone does not render rule 4.425(a)(3) inapplicable. The naming of separate victims in separate counts, a circumstance present here, also justifies imposing consecutive sentences. (*People v. Caesar* (2008) 167 Cal.App.4th 1050, 1061, disapproved on other grounds in *People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 18.)

Because the trial court considered the relevant factors for imposing consecutive sentences and Nesbit's crimes fit the criteria for such a sentence, it is not reasonably probable the court would have imposed concurrent sentences had Nesbit's counsel requested the court state its reasons on the record. Nesbit's objection therefore fails for lack of prejudice.

DISPOSITION

The judgments against defendants Fullmore and Nesbit are affirmed.


           HULL           , J.

We concur:


      NICHOLSON     , Acting P. J.


      DUARTE      , J.