Filed 1/16/26  P. v. King CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DEMITRIS DEVON KING,<br><br>Defendant and Appellant. | F087915<br><br>(Super. Ct. No. BF188511A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen, and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Justin Griffin, Jr. (Junior) was fatally shot while leaving a house party with his father, Justin Griffin, Sr. (Senior).[1] As they departed in Senior's car, a vehicle driven by Demitris Devon King (appellant) and occupied by David Earlvon Gray and Christian Francois Gaines followed them. Junior was an active gang member, and appellant, Gray, and Gaines were members of rival gangs. Several minutes later, appellant's car pulled alongside Senior's vehicle, and multiple shots were fired from its front passenger-side window, striking Senior's car repeatedly. Senior was uninjured, but Junior was shot once in the side of the head, killing him.

A jury convicted appellant of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b))[2] and discharging a firearm at an occupied motor vehicle (§ 246). The jury also found true the allegation that the murder was perpetrated by shooting a firearm from a motor vehicle (§ 190, subd. (d)). The trial court sentenced appellant to 20 years to life in state prison.

On appeal, appellant claims the trial court failed to properly instruct the jury on the theory of aiding and abetting murder with implied malice. Specifically, he alleges that the instructions did not require the jury to find that he personally harbored implied malice. We agree that instructional error occurred. Nevertheless, based on findings implicit in the jury's verdict and our review of the evidence, we conclude the error was harmless beyond a reasonable doubt. We affirm.

## FACTUAL BACKGROUND

### I. Introduction.

The Bloods, Eastside Crips, and Westside Crips, are criminal street gangs in the City of Bakersfield. The Warlord Piru Bloods are a subset of the Bloods gang. The

---

[1] For clarity, we refer to Justin Griffin, Jr. as "Junior," and Justin Griffin, Sr. as "Senior." No disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

Bloods and the Eastside Crips formed a de facto alliance in 2020, and their members generally associate without conflict. The Bloods and the Eastside Crips are rivals of the Westside Crips.

Appellant was an active Eastside Crips gang member. Gray and Gaines were active Warlord Piru Bloods gang members. Appellant and Gray are half brothers. Junior was an active member of the Westside Crips. Senior was a former member or associate of the Eastside Crips but no longer active.[3]

In November 2019, Jayden Laughlin, an active Warlord Piru Blood gang member, shot, but did not kill, the 16-year-old son of Senior and younger brother of Junior. Shortly after the shooting, an officer observed Laughlin leaving a nearby residence in a vehicle. At the residence, officers contacted Gray and several other Warlord Piru Bloods gang members, including Vannoy Sutton. The vehicle was driven by A.M., a close friend of appellant and Laughlin. For the shooting, Laughlin was convicted in 2023 of premeditated attempted murder (§§ 664, subd. (a), 187, subd. (a)) and assault with a semiautomatic firearm (§ 245, subd. (b)).[4]

In the weeks leading up to the instant murder, a photo was circulating on social media showing Junior standing beneath the street signs at the intersection of 10th Street and "M" Street. In the photo, Junior flashes the Warlord Piru Bloods hand sign with one hand and extends his middle finger toward the sign with the other. The People's gang expert explained this was an act of the "utmost disrespect" because the intersection of 10th Street and "M" Street is a Warlord Piru Bloods stronghold.

---

**3** The People's gang expert explained that it is not uncommon for family members to belong to different gangs.

**4** This court affirmed Laughlin's convictions on appeal. (*People v. Laughlin* (Jan. 2, 2025, F086433 [nonpub. opn.].)

## II. The Murder of Junior.

On the evening of November 3, 2021, A.M. hosted a birthday party for herself at a rented house with the help of her mother, L.W. The house was located at the end of a cul-de-sac in a residential neighborhood. Approximately 30 to 40 people attended the party, including appellant, Gray, Gaines, Laughlin, and several other Warlord Piru Bloods and Eastside Crips gang members. A.M.'s best friend, R.W., was also present.

L.W. was in a dating relationship with Senior, and she invited him to the party. He drove there in his black Impala. He arrived around 6:00 p.m. with food for the party. After socializing and drinking for a few hours, he decided to leave, and L.W. walked him out to his car.

Senior claimed he did not recognize any gang members at the party or see anyone he believed was responsible for the 2019 shooting of his 16-year-old son. However, L.W. testified that as they walked to his car, Senior told her that "[t]he dude who shot my son is at the party." Surveillance video from a nearby residence showed Gray, Laughlin, and C.G. (a Bloods gang member) arrived at the party together in the car about an hour before Senior.

Senior testified that after he left the party he went to a friend's house and smoked marijuana, then drove home. There, he sent a text message to Junior, and Junior drove to his house. He told Junior they were going to the party because some of his friends from high school were there, and so Junior could meet some girls.

While Senior was gone, appellant arrived at the party in his Malibu and parked in front of the party house. The Malibu was registered to the mother of appellant's children, but she described it as "his car." Surveillance footage showed that before Senior returned, the Malibu was moved up the cul-de-sac and out of view of the camera.

Senior and Junior drove back to the party in Senior's Impala and parked down the street. They entered through the front door and walked through the house into the backyard. Junior wore a mask that covered his nose and mouth. Junior was "acting

4.

observant" and looking around, and Senior was "mean-mugging" people. Party attendees began to scatter and move to other parts of the house, and there was an uncomfortable tension in the air. There were no arguments or altercations, but a few people told Junior he should not be there. A.M. and R.W. testified Junior's arrival was problematic because he is a Westside Crip gang member and several rival gang members were already present.

Minutes after they arrived, L.W. told Senior that he and Junior had to leave, then walked them out to Senior's Impala. Senior got into the driver's seat, and Junior got into the front passenger's seat.

Surveillance video from an adjacent residence showed that moments before Junior and Senior exited the party, Gray and Gaines were standing in the front yard. Gray can be heard stating: "On 10th Street dissing the hood that's bullshit." Approximately 20 seconds later, Junior and Senior leave the party through the front door. Appellant walks out behind Junior and Senior and joins Gray and Gaines. As Junior and Senior head toward Senior's Impala, appellant, Gray, and Gaines walk up the cul-de-sac in the direction of appellant's Malibu.

Senior testified that after leaving the party with Junior, he had no destination in mind and planned to "ride around." They initially drove eastbound on Planz Road. Surveillance footage from a residence on that street showed the Impala drive by, followed by the Malibu approximately 12 seconds later. Senior drove for several more city blocks, turning south, then west, and finally north onto New Stine Road. He did not notice anyone following them.

Senior stated that after he turned onto New Stine Road, he saw a car (the Malibu) driving behind them.[5] The Malibu pulled along his driver's side, and the front passenger's side window came halfway down. Senior saw muzzle flashes, ducked down,

---

[5] Senior gave only vague descriptions of the vehicle, identifying it as a blue or silver sedan. Because other evidence conclusively established that the car was appellant's Malibu, we refer to it as such for clarity.

and heard multiple gunshots. He was unable to identify his attackers and claimed he could not see into their vehicle.

The Impala was struck at least eight times on the driver's side. The location and trajectory of the strikes were consistent with the shooter or shooters firing from the rear driver's side and moving forward. Junior suffered a single gunshot wound to his left temple, killing him instantly. Senior was not hit.

The sound of the shooting was captured by nearby a surveillance camera. The audio recorded 10 to 12 gunshots fired in rapid succession. Based on the cadence of the shots, Detective F. McIntyre, the lead investigator for the murder, opined that the shots were fired by more than one firearm. The shots occurred about three minutes after Junior and Senior drove away from the party.

After the shooting, the Malibu continued northbound on New Stine Road, then turned east onto Planz Road. Senior testified he reached over to check on Junior and saw he was unresponsive. He armed himself with Junior's .40-caliber handgun, which was tucked between the front passenger's seat and the center console, then followed the Malibu.[6] About one minute later, Senior caught up to the Malibu on Planz Road and fired seven shots from inside of his car, striking the Malibu in the trunk and the right front fender. Senior then continued eastbound on Planz Road, and the Malibu turned north, back in the direction of the party house.

The sound of the second shooting was also recorded by a surveillance camera. The audio captured seven gunshots fired in rapid succession, with an even cadence that Detective McIntyre opined was consistent with only a single firearm being discharged. The second shooting occurred approximately 90 seconds after the first shooting.

Senior initially told investigating officers that Junior began returning fire at the Malibu while its occupants were still shooting at them on New Stine Road, and that he

---

**6** Senior claimed he did not realize Junior had a gun and did not see it until he reached over to check on him.

(Senior) never fired any shots. Senior later admitted to investigators that Junior never shot, but that he himself returned fire using Junior's gun after turning onto Planz Road. At trial, Senior testified that he lied because he feared he would face legal consequences if he admitted he had fired the shots. Senior testified with a grant of use immunity.

Senior testified that after the second shooting, he was distraught over the death of his son, so he drove aimlessly then pulled over somewhere and cried. After about 30 minutes, he drove to a nearby gas station and used the clerk's phone to call 911. Responding officers contacted Senior and observed Junior's body in the front passenger's seat of the Impala. There was a .40-caliber pistol at Junior's feet on the floorboard.

Surveillance footage showed the Malibu return to the party house about five minutes after the second shooting.[7] The car stops in the street in front of the house, Gray exits from the front passenger's side, and Gaines exits from the rear driver's side. As they exit, a male voice can be heard stating: "I was busting at the car I was shooting." Gray and Gaines run to the front of the party house as the Malibu makes a U-Turn and drives away. Several people exit the house, including L.W., A.M., and R.W. Gray and Gaines then get into Gaines's car and leave. In a law enforcement interview, R.W. stated Gray appeared to be in a hurry and told them they "needed to get out of there."[8]

## III.  Additional Evidence.

Appellant's Malibu was equipped with OnStar GPS tracking. OnStar records showed that the Malibu left the party at the same time as Junior and Senior and followed the same route they took from the party house to the location of the second shooting. The Malibu subsequently returned to the party house, consistent with surveillance footage, and then proceeded to appellant's residence, where it remained for the rest of the night.

---

[7]  The same camera showed Laughlin was in front of the party house approximately four minutes before the Malibu returned, consistent with the People's theory that Laughlin was not a passenger in the Malibu during the shooting.

[8]  At trial, R.W. testified she did not recall making this statement.

Additionally, cell phone location data for appellant, Gray, and Gaines demonstrated that, at the relevant times, their phones were in the general area of the party house and the shooting scenes. The records further showed that after returning to the party house, Gray and Gaines travelled to Gaines's residence.

Law enforcement officers found three expended nine-millimeter cartridge casings in the roadway along New Stine Road. The People's firearms expert opined that two of the casings were fired by the same firearm, and the third was fired by a different firearm.[9] In addition, seven expended .40-caliber cartridge casings were found in the roadway on Planz Road. The expert opined that the casings were all fired by Junior's .40-caliber handgun.

On November 2, 2021, the day before the murder, Gray sent R.W. messages on social media asking for "a ride to my gun." She picked him up, and he directed her to a motel, where he went inside alone and later returned to her car. She claimed she did not see a gun on his person.

On the night of the murder, about 40 minutes before Junior and Senior arrived, Gray used R.W.'s cell phone to record a video of himself at the party holding a gun.

About an hour after the murder, Gray sent appellant a message on social media asking, "[Y]ou good?" Appellant responded, "Hell, yeah. I think I hit something small cuz my shit running funny, lol," followed by another message stating, "It's a [s]mall hole in my shit."

The day after the murder, Gaines engaged in a text message conversation with a person identified as A.H. After A.H. stated she was on the phone with "Van," Gaines responded, "[T]ell him to check the score."[10] The People's gang expert explained that

---

[9] There was no evidence at trial that either nine-millimeter firearm was ever located.

[10] "Van" appears to be a reference to Vannoy Sutton, an influential Warlord Piru Bloods gang member who was incarcerated in county jail.

8.

"check the score" is a sports reference indicating that the gang has "scored a point" by killing a rival gang member.

## IV. Rap Videos.

### A. "*Top Opp.*"

A rap video titled "Top Opp" was posted to YouTube on November 23, 2021. Screen shots of the video and portions of the lyrics were admitted into evidence.

The song is performed by Gaines. Gray appears behind Gaines at various points. Gaines wears a red baseball cap with the letters "ru," a reference to the Warlord Piru Bloods gang. In portions of the video, Gaines stands in front of the street signs at the intersection of 11th Street and "M" Streets, one block from where the photo of Junior showing disrespect to the Warlord Piru Bloods was taken. He also holds up his middle finger next to a hand sign for a subset of the Westside Crips gang.

In the lyrics of the rap song, Gaines states, "[T]rying to knock you and your main man. Ain't fucking with no ghosts Glock. Last skit that bitch jam." Detective McIntyre explained that a "ghost Glock" is a self-built Glock style firearm, and a "skit" is a term used by gang members to refer to a shooting. At another point in the song, Gaines states, "I love Lil Weez to the grave, I promise always foo." "Weez" is Gray's moniker.

Gaines's cell phone was seized and searched by law enforcement. The Notes application on the cell phone contained a number of apparent rap lyrics. Forensic analysis of the phone revealed that on November 4, 2021, the day after Junior's murder, references to "ghost Glock," "the last skit," and "I love Lil Weez," were added to the notes.

Six days after the murder, appellant used his cell phone to conduct 13 internet searches regarding whether a bullet fired from a "ghost gun" can be traced to the firearm that discharged it.

**B.** ***"On the Head."***

A rap video titled "On the Head" was uploaded to YouTube on December 1, 2021. The song is performed by Laughlin. The video was played for the jury in its entirety.

Near the beginning of the rap song, Laughlin states: "You ain't pop a sucka bout cha brother." Detective McIntyre opined this appears to be a reference to Laughlin having shot Junior's younger brother.

Later in the song, Laughlin states: "I told lil Weez go do your shit, bitch he ain't stop at all … Broadie almost put us up by two, but it wasn't yankin right[.] Four poles, four [n-word], bitch you might get spanked tonight." Detective McIntyre explained that "put us up by two" is a sports reference used by gang members for killing two people, and "wasn't yanking right" is slang for a gun not shooting properly or malfunctioning. He opined this language was significant because there were two people in the Impala when Junior was killed.

Two weeks before "On the Head" was posted to YouTube, Gray sent a message to Laughlin over social media stating, "On the Head." Laughlin responded, "[B]itch, why not that one?" Gray replied, "[C]ause you're speaking facts and it adds up to other shit."

## V.     The Rufus Shooting.

On August 14, 2021, at approximately 4:00 a.m., officers responded to a ShotSpotter activation at a duplex on South Haley Street.[11] There, officers discovered the body of Desmond Rufus, an Eastside Crip gang member, on the ground next to the front door of unit "B." Rufus had sustained a gunshot wound to head and was deceased.

When officers arrived, there was a crowd of five to 10 people standing around Rufus's body, including two Eastside Crip gang members. Inside unit "B," officers contacted Gray, Laughlin, and two other individuals.

---

[11]     Officers were informed that ShotSpotter detected three separate volleys, consisting of 13 shots, 3 shots, and 15 shots, all occurring within 38 seconds.

Law enforcement personnel discovered fourteen 5.56-caliber cartridge casings in the street and on the sidewalk in front of the duplex. Inside the fence line, officers found 8 nine-millimeter cartridge casings. The nine-millimeter casings were located along a walking path that runs directly from the street to a parking area in the back of the duplex immediately behind unit B. The front door of unit B opens onto this same walking path. In the parking area, officers discovered 7 nine-millimeter cartridge casings and five .40-caliber cartridge casings. There were numerous bullet strikes on the front of the duplex. There were also bullet strikes on a fence behind the parking area, and at least one bullet strike on a car parked across in front of the duplex.

The People's firearms expert opined that six of the nine-millimeter cartridge casings recovered from the parking area were fired by the same firearm as one of the nine-millimeter cartridge casings recovered from the shooting scene on New Stine Road where Junior was killed.

## VI.    Appellant's Statements.

### A.    *Law enforcement interview*.

Appellant was arrested on December 9, 2021, and interviewed by law enforcement. A recording of the interview was admitted into evidence and played for appellant's jury.

Appellant admitted he went to the house party. He drove there alone in his Malibu. Gray was already there when he arrived. He claimed that after about half an hour, the party host became upset and told everyone to leave. As he exited the party house, he was told the party was shut down because someone from a "different side" showed up uninvited.

Appellant identified Junior as his cousin. He claimed he never saw Junior at the party and was unaware of any conflict between Junior and Gray or other Bloods gang members. However, he acknowledged that Gray is a member of the Bloods, and that he

11.

was aware of the photo of Junior at 10th Street and "M" Street. He agreed this was "pretty brash" of Junior. He denied seeing Gray with a gun that evening.

Appellant stated that after he exited the party, Gray told appellant to follow him to a bar. He got into his car and began following Gray, who was in another car. When he reached Planz Road, he heard gunshots and ducked down. He claimed the bullet holes in his Malibu were caused by those gunshots. After the shooting, he went to another party, then went home. He denied giving Gray or any of Gray's friends a ride in his car that night.

The interviewing officers confronted appellant with the surveillance video showing him drop off Gray and Gaines in front of the party house after the shooting. Despite this, appellant continued to insist that no one else was in his car that night, and he repeatedly denied any involvement in the shooting.

**B.** *Jail call.*

On December 25, 2021, appellant called the mother of his children from jail. While discussing the investigation into the shooting, appellant stated he was not "willing to turn on [his] brother." Moments later, appellant stated: "Y'all can't even get me first degree murder. I wasn't the one that pulled the fucking trigger."

## VII. Defense Evidence.

Gaines's godmother testified that she used to be in a dating relationship with Senior. She stated that every time she saw Senior, he had a gun. The last time she saw him with a gun was in early 2021. She stated Senior used to be affiliated with the Eastside Crips, and he told her that he carried a gun because "people still knew him," and he "never knew who would try to get him."

Gaines called several friends and family members who testified that they had reviewed the surveillance video showing Gray and Gaines exit the Malibu in front of the party house after the shooting. They each opined that the voice stating, "I was busting at the car I was shooting," did not belong to Gaines.

12.

## PROCEDURAL BACKGROUND

The Kern County District Attorney's Office filed an information charging appellant, Gray, and Gaines with first degree murder (§§ 187, subd. (a), 189, count 1) and discharging a firearm at an occupied motor vehicle (§ 246; count 2). Gray and Gaines were also charged with participation in a criminal street gang. (§ 186.22, subd. (a); count 3). As to count 1, the People alleged discharge of a firearm from a motor vehicle special circumstance (§ 190.2, subd. (a)(21)) and gang-murder special circumstance (§ 190.2, subd. (a)(22)). As to counts 1 and 2, the People alleged gang enhancements (§ 186.22, subd. (b)(1)) and gang-related firearm enhancements (§ 12022.53, subds. (d), (e)(1)). Prior to trial, the trial court granted the People's motion to dismiss the gang-murder special-circumstance allegation as to appellant only.

Appellant, Gray, and Gaines were tried jointly. To avoid prospective *Aranda/Bruton*[12] issues, the trial court empaneled two juries: one for Gray; the other for appellant and Gaines. The trial court also elected to bifurcate count 3, the gang-murder special-circumstance allegation, the gang enhancements, and the gang-related firearm enhancements. (See § 1109.)

On count 1, the jury found appellant not guilty of first degree murder, but guilty of second degree murder, and found true the allegation that the murder was perpetrated by shooting a firearm from a motor vehicle (§ 190, subd. (d)). The jury also found appellant guilty of discharging a firearm at an occupied motor vehicle (count 2). As to Gaines, the jury was unable to reach a verdict on either count, and a mistrial was declared.

After the verdicts were returned, the parties reached a negotiated plea agreement on the remaining enhancements and allegations, avoiding the need to proceed with the bifurcated phase of the trial. Specifically, appellant agreed to admit the section 186.22,

---

[12] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

subdivision (b)(1) gang enhancement, in exchange for dismissal of the remaining enhancements and allegations.

The trial court sentenced appellant as follows.  On count 1, the court sentenced appellant to 20 years to life in state prison.  On count 2, the court sentenced appellant to 15 years to life, but stayed the sentence pursuant to section 654, subdivision (a).  (See § 186.22, subd. (b)(4)(B).)

## DISCUSSION

### I. Instructional Error Regarding Aiding and Abetting Murder with Implied Malice Occurred, But the Error Was Harmless Beyond a Reasonable Doubt.

The People's position at trial was that appellant acted as the driver and was liable for murder as an aider and abettor.  In light of the evidence, we agree with appellant that the jury likely based his second degree murder conviction on aider and abettor liability.  The jury instructions permitted the jury to convict appellant of second degree murder as an aider and abettor under two theories: aiding and abetting murder with express malice, and aiding and abetting murder with implied malice.  On this record, we cannot determine with certainty which theory the jury relied on in reaching its verdict.

Appellant's instructional error claim is based on the theory of aiding and abetting murder with implied malice.  He contends the instructions as given erroneously permitted conviction under that theory without finding he personally acted with malice aforethought.

We agree that instructional error occurred, but we conclude the error was harmless beyond a reasonable doubt.  The verdicts demonstrate that the jury necessarily found appellant knowingly and intentionally aided Gray in the commission of the shooting.  In light of these findings, and the conclusive evidence that appellant assisted Gray by serving as the driver, pursuing the intended targets, and positioning his Malibu alongside the Impala to give Gray a clear shot at the victims, we conclude that no reasonable jury could fail to additionally find that appellant acted with implied malice.

14.

## A. Background.

The trial court instructed the jury with CALCRIM No. 401 (Aiding and Abetting: Intended Crimes) as follows:

> "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "1. The perpetrator committed the crime;
>
> "2. The defendant knew that the perpetrator intended to commit the crime;
>
> "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
>
> "AND
>
> "4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> "Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime."

The trial court also gave CALCRIM No. 520 (First or Second Degree Murder with Malice Aforethought), which instructed that murder requires proof the defendant committed a fatal act with the mental state of malice aforethought, which may be express or implied. The instruction also explained that a defendant acted with implied malice if: "1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

## B. Standard of review.

In a criminal case, the trial court must instruct the jury on the essential elements of a charged offense (*People v. Merritt* (2017) 2 Cal.5th 819, 824) and on the general

15.

principles of law relevant to the issues raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189).

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

### C.  *Instructional error occurred*.

Murder is the unlawful killing of another with express or implied malice aforethought. (§§ 187, subd. (a), 188; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1220.) Malice is express where the perpetrator acted with an unlawful intent to kill. (§ 188, subd. (a)(1)). Malice may be implied where (1) the perpetrator intentionally committed an act (or failed to act); (2) the natural and probable consequences of that act involved a high degree of probability that it would result in death; (3) at the time, the perpetrator knew the act was dangerous to human life; and (4) the perpetrator acted (or failed to act) with conscious disregard for human life. (§ 188; *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*); *People v. Blakeley* (2000) 23 Cal.4th 82, 87; CALCRIM No. 520.) Murder is in the second degree unless the prosecution proves beyond a reasonable doubt the circumstances that elevate it to first degree murder. (§ 189, subds. (a) & (b); CALCRIM No. 520.)

A person may be liable for murder as a direct perpetrator or as an aider and abettor. (§ 31, see *People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) However, following the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.), which eliminated the natural and probable consequences doctrine as a basis for murder liability, an aider and

16.

abettor may be convicted of murder only if he or she personally acted with malice. (*People v. Gentile* (2020) 10 Cal.5th 830, 846; § 188, subd. (a)(3) [malice cannot be imputed based solely on participation in a crime].)  Thus, an aider and abettor who does not intend to aid in a killing can be convicted of murder only if " 'the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' "  (*Reyes, supra,* 14 Cal.5th at p. 990.)  Specifically, the aider and abettor must know the perpetrator intends to commit the life endangering act that results in death, intend to assist in that act, and personally act with conscious disregard for human life. (*Id.* at p. 991, citing *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 (*Powell*).)

Here, instructional error occurred because the jury was not informed of this personal malice requirement.  Under CALCRIM No. 401, the jury was instructed that to find appellant liable as an aider and abettor, it had to find that he knew the perpetrator intended to commit a particular crime and that appellant intended to aid and abet the perpetrator in committing that crime.  While CALCRIM No. 520 required the jury to find that the *perpetrator* committed a life-endangering act with conscious disregard, CALCRIM No. 401 did not impose that same requirement on an aider and abettor.[13] Thus, the jury instructions did not specify that appellant, as an aider and abettor, was required to have his own implied malice for murder.[14]

Other appellate courts have similarly recognized that CALCRIM No. 401 is "not tailored" for a theory of implied malice murder by an aider and abettor.  (See *Powell, supra,* 63 Cal.App.5th at p. 714; *People v. Langi* (2022) 73 Cal.App.5th 972, 982–983

---

[13]    In September 2023, two months before the instant trial, the Judicial Council issued CALCRIM No. 526 (Implied Malice Murder: Aiding and Abetting).  This new pattern instruction accurately sets forth the elements of aiding and abetting murder with implied malice.  No party requested this instruction be given at trial.

[14]    Because the instructional error pertained to the elements of a charged offense, we reject respondent's assertion that appellant forfeited the claim by failing to object below. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

(*Langi*); *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1266.) Consistent with our view, these courts reason that the language of CALCRIM No. 401 creates an ambiguity that allows a conviction for aiding and abetting murder without a finding that the defendant personally acted with malice. [15] (*Langi,* at pp. 982–983; *Powell,* at p. 714, *People v. Maldonado, supra,* 87 Cal.App.5th at p. 1266.)

Accordingly, we agree with appellant that the jury was not properly instructed on the malice requirement for aiding and abetting murder under an implied malice theory. The jury was never told that appellant could be liable for second degree murder under this theory only if he knew his own conduct was dangerous to human life and acted with conscious disregard for that danger. (See *Reyes, supra*, 14 Cal.5th at p. 990.) Having determined instructional error occurred, we next address the issue of prejudice.

### D.     *The instructional error was harmless beyond a reasonable doubt.*

The prejudicial effect of the omission of an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*Neder v. United States* (1999) 527 U.S. 1, 4; *People v. Mil* (2012) 53 Cal.4th 400, 409.) Under this standard, we may affirm the jury's verdict despite the error "if it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue." (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.) In conducting this review, we thoroughly examine the entire record to determine whether it "contains evidence that could rationally lead to a contrary finding with respect to the omitted element." (*Neder v. United States, supra,* 527 U.S. at p. 19.) We also consider "what the jury, properly instructed, necessarily found," and ask whether a "reasonable jury that made all of these findings could have failed to find" the omitted element. (*People v. Merritt, supra,*

---

[15]     Respondent contends that *Powell* was wrongly decided and that no instructional error occurred. However, our Supreme Court recently cited *Powell* and *Langi*, with approval. (*Reyes, supra,* 14 Cal.5th at p. 990.) In light of this endorsement, we decline to disregard *Powell* and reject respondent's argument to the contrary.

2 Cal.5th 819 at p. 832; see *In re Lopez* (2023) 14 Cal.5th 562, 580; *People v. Chun* (2009) 45 Cal.4th 1172, 1204–1205.)

We begin our analysis with the findings implicit in the jury's verdict. In addition to second degree murder, the jury convicted appellant of discharging a firearm at an occupied motor vehicle (§ 246; count 2). In reaching this verdict under and aider and abettor theory, the jury necessarily found that Gray—the direct perpetrator—intentionally fired at the Impala occupied by Junior and Senior. Furthermore, the jury necessarily found that appellant knew Gray intended to commit that offense, and that appellant intentionally aided Gray in doing so.

The jury also found true the allegation that the second degree murder was committed by shooting a firearm from a motor vehicle. (§ 190, subd. (d).) Thus, the jury necessarily found that Gray intentionally shot at a person who was outside of the vehicle with the intent to inflict great bodily injury on that person. (See CALCRIM No. 525.)

Given these verdicts, the prejudice inquiry reduces to whether a reasonable jury that found appellant knowingly and intentionally aided Gray in the shooting could nevertheless have failed to find that he personally harbored implied malice. Based on our review of the record, we conclude no reasonable jury could fail to make such a finding.

Shooting a firearm at an occupied vehicle is an inherently dangerous act carrying a high probability of death. While we recognize that the inherent dangerousness of the act is not dispositive (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107), conduct that carries a high probability of death strongly supports an inference that the defendant was subjectively aware of the risk. (Cf. *People v. Moore* (2010) 187 Cal.App.4th 937, 941 [reasoning defendant must have been subjectively aware his extraordinarily reckless driving was dangerous to human life because "anyone would be aware of the risk"].) This is particularly true when one fires at an occupied vehicle, as doing so almost invariably places the occupants at risk of being shot.

Beyond the inherent danger of shooting at an occupied vehicle, appellant engaged in conduct that increased the likelihood that the intended targets would be injured or killed. The evidence conclusively established that appellant and Gray acted with the singular purpose of committing a violent act against a rival. As Junior and Senior were escorted out of the house party, appellant, Gray and Gaines proceeded to appellant's Malibu. Appellant then pursued Senior's Impala for several minutes as it traveled multiple city blocks, making several turns along the way. Upon catching up to the Impala on New Stine Road, appellant pulled his Malibu alongside it, enabling Gray to fire multiple shots at close range from the passenger's seat. Thus, given the manner in which appellant aided Gray in the shooting, the only reasonable inference is that he knowingly engaged in life-endangering conduct and acted with conscious disregard for that danger, even absent a specific intent to kill.

Based on this record, it is beyond a reasonable doubt that the instructional error was harmless. The jury found appellant knowingly and intentionally aided Gray in the commission of the shooting, and that Gray acted with the intent to inflict great bodily injury. The evidence conclusively showed that appellant assisted Gray in carrying out the shooting by pursuing the targets and positioning his car so that Gray had a clear shot at the Impala and its occupants. Given the jury's findings and this evidence, no reasonable jury could fail to also find that appellant acted with implied malice. Accordingly, we conclude beyond a reasonable doubt that the instructional error did not contribute to the verdict, and this claim lacks merit. (See *Chapman, supra,* 386 U.S. at p. 24.)

## II. The Indeterminate Abstract of Judgment Has a Clerical Error That Must be Corrected.

The indeterminate abstract of judgment incorrectly lists appellant's conviction on count 1 as "MURDER: FIRST DEGREE." We direct the trial court to amend the indeterminate abstract to reflect appellant was convicted of second degree murder on

20.

count 1.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [an appellate court may correct clerical errors in an abstract of judgment].)

## **DISPOSITION**

The trial court is directed to prepare an amended indeterminate abstract reflecting appellant was convicted of second degree murder on count 1.  The trial court shall then forward the amended abstract of judgment to the appropriate entities.  In all other respects, the judgment is affirmed.


LEVY, J.

WE CONCUR:


HILL, P. J.


HARRELL, J.